764

CECILIA (CÉCILE) PIACENTINI ET AL., Plaintiffs and Appellees,
v. R. SANCHO BONET, substituted by RAFAEL BUSCAGLIA,
TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 8255. Argued June 10, 1941.—Decided January 23, 1942.
Rehearing denied February 18, 1942.

*George A. Malcolm, Attorney General,* and *M. Rodríguez Ramos, Assistant Attorney General,* for appellant. *José A. Poventud* for appellees.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

Andrés Emanuelli Costa died in Adjuntas, Puerto Rico, on July 2, 1934, leaving a will in which he designated as his sole heir, in full ownership, his sister María Angela Emanuelli,

widow of Antoni, a French citizen domiciled and residing in France. The latter also died on November 15, 1939, and left as her sole heirs her two nieces, plaintiffs herein, who are French citizens and have always resided in France.

The estate left by Emanuelli to his sister and by the latter to the plaintiffs amounted to $65,041, and may be classified as follows:

| | |
|---|---:|
| 1. Cash in a bank in New York | $6, 258. 80 |
| 2. Cash in a bank in Puerto Rico | 1, 273. 13 |
| 3. Government bonds and stock of foreign companies deposited in the National City Bank of New York U.S.A. | 27, 287. 35 |
| 4. Special partner's contribution to the firm of A. Emanuelli & Co., *S. en C.*, with a nominal value of $20,499.39 and actual value not exceeding | 10, 000. 00 |
| 5. Shares of stock, promissory notes, current account balance, mortgage credit, and effects located in Ponce | 20, 221. 72 |
| | $65, 041. 00 |

On January 18, 1936, the plaintiffs advised the Treasurer of the death of both decedents and alleged, concerning the estate of María Angela Emanuelli, that the whole of said estate was exempt from the insular inheritance tax: (*a*) because the decedent never resided in Puerto Rico and had always been a citizen and resident of France where she died; and (*b*) because, as the estate consisted of intangible property—with the exception of $3.37 in cash, a watch and chain valued at $20, which came within the legal exemption of $200 —not only had it not been taxed by the Legislature, upon being transmitted in full ownership by a nonresident alien to his heirs, but it could not have been constitutionally taxed either, as its situs for taxation purposes was not in Puerto Rico but in France where the testatrix had her domicile.

On January 30, 1936, the Treasurer notified the plaintiffs that he had allowed them "such exemption as was provided by law, that is, the one referring to intangible personal property which had its situs in the domicile of the decedent";

that the hereditary portions subject to taxation had been appraised at $41,953.04, or $20,976.52 for each of the heirs; and that he had assessed to each of them a tax amounting to $1,314.90, or a total of $2,629.80.

Upon an appeal being taken from the ruling of the Treasurer to the Board of Review and Equalization, said board decided to exclude from the valuation made by the Treasurer the sum of $6,258.80 which the testatrix had left in cash in the National City Bank of New York, in the city of New York, "as being personal property not located in Puerto Rico and belonging to a nonresident of Puerto Rico." The valuation was thus reduced to $35,694.24, which the Treasurer took as a basis for assessing to each of the plaintiffs as a tax the sum of $1,033.25, or a total of $2,066.50. This amount was paid by the plaintiffs under protest, together with $268.65 as interest thereon accrued up to the time of its payment. In order to recover the total amount of $2,335.15 paid under protest, plus legal interest thereon, costs, and attorney's fees, the plaintiffs brought an action in the District Court of Ponce.

The defendant in his answer denied that the capital contributed by the special partner to the firm of A. Emanuelli & Co., *S. en C.*, actually amounted to $10,000, and on the contrary alleged that the actual value of the capital so contributed was $20,499.39. He further denied that the property, regarding which exemption from taxation was claimed, was intangible property, or that its situs was in France, and on the contrary alleged that the property on which the inheritance tax was levied, and the location and value thereof were as follows:

| | |
|---|---:|
| 1. Two bank deposits in Ponce, Puerto Rico totaling____ | $1,269.76 |
| 2. Special partner's contribution to the firm of A. Emanuelli & Co., *S. en C.*, appraised by the Treasurer at | 20,499.39 |
| 3. Balance of current account with said partnership_____ | 8,901.72 |
| 4. Credit secured by mortgage, the principal of which amounts to _____ | 5,000.00 |
| 5. Jewels ($20) and cash ($3.37), totaling_____ | 23.37 |
| | $35,694.24 |

It was further alleged by the defendant that all the property above described is tangible property; that its situs is in Puerto Rico and not in France; and that said property is subject to inheritance tax under the laws now in force and especially Act No. 99 of August 29, 1925, (Session Laws, p. 790); and that the said laws are in harmony with the provisions of the Federal Constitution and the Organic Act of Puerto Rico.

On March 28, 1939, the lower court rendered judgment for the plaintiffs and ordered the refund of the sum claimed, with interest thereon at 6 per cent per annum from June 12, 1936, until fully paid without costs or attorney's fees. Feeling aggrieved by that judgment, the Treasurer appealed, and in support of his appeal he urges that the lower court erred in overruling the demurrer to the complaint; in holding that the intangible property had its situs solely in France and that said property was not subject to taxation in Puerto Rico; in holding that the intangible property was exempt from taxation because the total value thereof did not exceed $200; and in sustaining the complaint. As there is only one legal question involved, we will consider all those assignments together.

■■ The enactment under which the taxes in the instant case were assessed and collected is Section 1 of Act No. 99 of August 29, 1925, as amended by Act No. 43 of April 24, 1931 (Sess. Laws, p. 368), which reads as follows:

"Section 1.—All real property within Porto Rico and any interest therein, whether or not belonging to residents of Porto Rico; all personal property within or without Porto Rico belonging to residents of Porto Rico, *and all personal property in Porto Rico belonging to non-residents of Porto Rico,* which passes by will, intestacy or inheritance or by any donation made, the intention of which is to grant possession, nude ownership or usufruct after the death of the donor, to any person, association, institution or corporation, in trust or otherwise, shall be subject to a tax as hereinafter provided; . . . ." (Italics ours.)

It is urged by the appellant Treasurer that, as the property inherited by the plaintiffs "consists of personal property in Porto Rico belonging to non-residents of Porto Rico," its transmission by will is subject to the inheritance tax in accordance with the cited statute.

That the property constituting the estate and which has been taxed is *personal* property is a question already determined by this court in *McCormick* v. *Domenech*, 44 P.R.R. 621, 622. There it was sought to recover taxes levied on cash deposits, bond certificates, shares of stock, and policies, deposited in banks located outside Puerto Rico by the testator who was a resident of Puerto Rico. In deciding that such property was subject to inheritance tax, this Supreme Court said:

"Section 368 of the Political Code, as modified and amplified by Act No. 99 of 1925 (Session Laws, p. 790), imposes an inheritance tax on all real property and personal property owned by residents of Puerto Rico. The credits of the deceased consisting in the funds, bonds, and stock certificates which he owned *are intangible personal property* and are subject to tax according to that statute, as are also his insurance policies, which we must assume are payable to his estate, no allegation to the contrary having been made." (Italics ours.)

It having been settled, then, that intangible personal property belonging to a testator residing in Puerto Rico and deposited outside the Island of Puerto Rico is subject to an inheritance tax, we must now determine whether such tax can be validly levied where said personal property is deposited in Puerto Rico and the testator resided without the Island.

The language of Section 1 of the Inheritance Tax Act, *supra*, is so clear that we can have no doubt that it was the intention of the lawmaker that the tax should be levied on every testamentary transmission of intangible personal property located or deposited in Puerto Rico and belonging to a testator residing outside this island. However, the plaintiffs and appellees contend—and it was so held by the lower court —that the levying of the tax on intangible property located

or deposited in Puerto Rico is unlawful and constitutes a violation of their constitutional rights guaranteed by the Fourteenth Amendment to the Federal Constitution and by the Insular Organic Act.

The question involved in the present appeal is new in this jurisdiction; but it has been considered and determined both by federal courts and by some state courts, as may be seen from the decisions which we shall discuss presently. .

The case of *Blackstone* v. *Miller,* 188 U.S. 189, 47 L. Ed. 439, decided in 1903, had reference to a testator who died in the State of Illinois where he was domiciled and who left large sums of money deposited in a bank in New York. The State of New York levied and collected an inheritance tax on the money so deposited. In deciding that the levying of such tax was valid, the Federal Supreme Court said:

"No doubt this power on the part of two States to tax on different and more or less inconsistent principles, leads to some hardship. It may be regretted, also, that one and the same State should be seen taxing on the one hand according to the fact of power, and on the other, at the same time, according to the fiction that, in successions after death, *mobilia sequuntur personam* and domicil governs the whole. But these inconsistencies infringe no rule of constitutional law."

The rule laid down in *Blakstone* v. *Miller, supra,* was followed in numerous cases until 1930, when the question was submitted again to the Supreme Court in *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U.S. 204, 74 L.Ed. 371. In the latter case the testator, Taylor, died while domiciled in New York. His estate included negotiable bonds and loan certificates issued by two municipalities in the State of Minnesota. The testator had owned and kept such bonds and certificates for a long time in New York. The State of New York levied an inheritance tax upon the testamentary transfer of said securities. The State of Minnesota also levied a similar tax. Upon the question being submitted for the first time to the Supreme Court of Minnesota, the latter held that negotiable

public securities were something more than mere evidence of indebtedness and that as in the case of tangible property, they could only be taxed where they were deposited, irrespective of the domicile of their holder. Subsequently, after the decision in *Blodgett* v. *Silberman,* 277 U.S. 1, 72 L. Ed. 749, upon a motion for rehearing, the Supreme Court of Minnesota, in view of said decision and the holding in *Blackstone* v. *Miller, supra,* felt itself bound to consider the bonds and certificates in question merely as choses in action and upheld the validity of the tax. The Federal Supreme Court reversed the judgment of the Supreme Court of Minnesota, Mr. Justice Holmes and Mr. Justice Brandeis dissenting, and said:

"*Blackstone* v. *Miller, supra,* and certain approving opinions, lend support to the doctrine that ordinarily choses in action are subject to taxation both at the debtor's domicile and at the domicile of the creditor; that two States may tax on different and more or less inconsistent principles the same testamentary transfer of such property without conflict with the Fourteenth Amendment. The inevitable tendency of that view is to disturb good relations among the States and produce the kind of discontent expected to subside after establishment of the Union. The Federalist, No. VII. The practical effect of it has been bad; perhaps two-thirds of the States have endeavored to avoid the evil by resort to reciprocal exemption laws. It has been stoutly assailed on principle. Having reconsidered the supporting arguments in the light of our more recent opinions, we are compelled to declare it untenable. *Blackstone* v. *Miller* no longer can be regarded as a correct exposition of existing law; and to prevent misunderstanding it is definitely overruled.

"Four different views concerning the situs for taxation of negotiable public obligations have been advanced. One fixes this at the domicile of the owner; another at the debtor's domicile; a third at the place where the instruments are found—physically present; and the fourth within the jurisdiction where the owner has caused them to become integral parts of a localized business. If each State can adopt any one of these and tax accordingly obviously, the same bonds may be declared present for taxation in two, or three, or four places at the same moment. Such a startling possibility suggests a wrong premise.

"In this Court the presently approved doctrine is that no State may tax anything not within her jurisdiction without violating the Fourteenth Amendment."

The doctrine laid down by the Federal Supreme Court in *Farmers Loan & Trust Co.* v. *Minnesota, supra*—to the effect that the States and Territories are without power to tax such intangible property as, being located within their respective territory, has its situs for taxation purposes within another State or Territory—has been applied in numerous subsequent decisions. See *Union Central Life* v. *Treasury,* 19 P.R.R. 856; *Domenech* v. *U. P. R. Sugar Company,* 289 U. S. 739, 77 L. Ed. 1489, affirming a judgment of the Circuit Court, 62 F. (2d) 552; *First National Bank* v. *Maine,* 284 U.S. 312, 76 L. Ed. 319; *Baldwin* v. *Missouri,* 281 U.S. 586, 74 L. Ed. 1059; *Rhode Island Hospital Trust Co.* v. *Doughton,* 270 U.S. 69; 70 L. Ed. 475.

In none of the above-cited cases the real question involved in the present litigation was either considered or determined, that is, whether a State or Territory could validly and constitutionally impose an inheritance tax on intangible property having its situs within said state or territory and belonging to a person domiciled in a foreign country.

In *Burnet* v. *Brooks,* 288 U.S. 378, 77 L. Ed. 844, decided in 1933, the testator, who was a British citizen domiciled in Cuba and had never engaged in business in the United States, left, in the latter country, government bonds, foreign corporations bonds, American corporations bonds, foreign stock certificates, and a cash balance in a bank. In upholding the validity of the tax levied by the Commissioner of Internal Revenue upon such intangible property, the Federal Supreme Court said:

". . . Two questions are presented.—(1) whether the property in question is covered by these provisions, and (2) whether, if construed to be applicable, they are valid under the Fifth Amendment of the Federal Constitution. The decisions below answered the first question in the negative.

"*First.* The first question is one of legislative intention. In the case of a nonresident of the United States, that part of the gross estate was to be returned and valued 'which at the time of his death is situated in the United States.' In interpreting this clause, regard must be had to the purpose in view. The Congress was exercising its taxing power. Defining the subject of its exercise, the Congress resorted to a general description referring to the situs of the property. The statute made no distinction between tangible and intangible property. It did not except intangibles. It did not except securities. Save as stated, it did not except debts due to a nonresident from resident debtors. As to tangibles and intangibles alike, it made the test one of situs, and we think it is clear that the reference is to property which, according to accepted principles, could be deemed to have a situs in this country for the purpose of the exertion of the Federal power of taxation. Again, so far as the intention of the Congress is concerned, we think that the principles thus impliedly invoked by the statute were the principles theretofore declared and then held. It is quite inadmissible to assume that the Congress exerting Federal power was legislating in disregard of existing doctrine, or to view its intention in the light of decisions as to State power which were not rendered until several years later. The argument is pressed that the reference to situs must, as to intangibles, be taken to incorporate the principle of *mobilia sequuntur personam*, and thus, for example, that the bonds here in question though physically in New York should be regarded as situated in Cuba where decedent resided. But the Congress did not enact a maxim. When the statute was passed it was well established that the taxing power could reach such securities in the view that they had a situs where they were physically located. As securities thus actually present in this country were regarded as having a situs here for the purpose of taxation, we are unable to say that the Congress in its broad description, embracing all property 'situated in the United States,' intended to exclude such securities from the gross estate to be returned and valued."

In *Burnet* v. *Brooks, supra,* the Federal Supreme Court cited with approval the decision in *DeGanay* v. *Lederer*, 250 U.S. 376, 63 L.Ed. 1042, where it was said:

"The question certified is: 'If an alien non-resident own stocks, bonds, and mortgages secured upon property in the United States or payable by persons or corporations there domiciled; and if the

income therefrom is collected for and remitted to such non-resident by an agent domiciled in the United Stated; and if the agent has physical possession of the certificates of stock, the bonds and the mortgages; is such income subjet to an income tax under the Act of October 3d, 1913?'

''The question submitted comes to this: Is the income from the stock, bonds and mortgages, held by the Pennsylvania Company, derived from property owned in the United States? A learned argument is made to the effect that the stock certificates, bonds and mortgages are not property, that they are but evidences of the owner ship of interests which are property; that the property, in a legal sense, represented by the securities, would exist if the physical evidences thereof were destroyed. But we are of opinion that these refinements are not decisive of the congressional intent in using the term 'property' in this statute. Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages, and certificates of stock are regarded as property. By state and federal statutes they are often treated as property, not as mere evidences of the interest which they represent. . . .

    '' *        * *        * *        * *        * *        * *        * *

''We have no doubt that the securities, herein involved, are property. Are they property within the United States? It is insisted that the maxim *mobila sequuntur personam* applies in this instance, and that the situs of the property was at the domicile of the owner in France. But this court has frequently declared that the maxim, a fiction at most, must yield to the facts and circumstances of cases which require it; and that notes, bonds and mortgages may acquire a situs at a place other than the docimile of the owner, and be there reached by the taxing authority.''

We have no doubt that, if the testatrix in the case at bar had died while domiciled within a State or Territory of the United States, the Government of Puerto Rico could not, in accordance with the decision in *Farmers Loan & Trust Co.*, *supra*, levy an inheritance tax upon bonds or intangible property actually located in Puerto Rico. However, the fundamental reason which the Supreme Court had for overruling

its decision in *Blackstone* v. *Miller*—to avoid disturbing the good relations that ought to exist between the States—can not be invoked in the case at bar; for here, as happened in the case of *Burnet* v. *Brooks, supra,* the testatrix at the time of her death was domiciled in a foreign country. Therefore, no possible conflict can arise between two or more States of the Union.

The case *In re McCreery's Estate,* 220 Cal. 26, 29 P. (2d) 186, involved the same question which is now presented to us. There the State of California had levied and collected an inheritance tax upon a certain number of stock certificates of a domestic corporation, which were deposited within the State. The testator was a British subject who resided in Great Britain at the time of his death. The Supreme Court of California upheld the validity of the tax, saying:

"... We have made a careful study of the several decisions cited and the net result of such holdings thus far is that, as to tangible personal property, the fourteenth amendment to the federal Constitution forbids its taxation in any other state of the United States than the one in which it is located; that as to choses in action and other intangibles, the same section forbids taxation in more than one state. The constitutional provision protects the one class of property to the same extent as the other. The only difference in the two situations is that as to intangibles the courts still apply the legal fiction of *mobila sequuntur personam* and have thus confined the place of taxation to the state of the domicile of the owner. *But this restriction has as yet been applied only to estates of decedents who were residents within the United States.* (Citations.) The rule which selects the domicile, as distinguished from the situs of the intangibles, was and is largely one of logic and convenience. But the reason assigned for this selection all fail where the decedent was domiciled without the United States. It by no means seems certain that a valid rule could not have been promulgated which fixed the constructive situs of the intangibles as the place of taxation instead of the domicile of the owner. Moreover, the above-cited holding does not specifically purport to fix the rule controlling the jurisdiction for taxation where the owner of the intangibles was domiciled without the United States, whether he was a citizen of the United States

or a citizen of a foreign nation. Intangible property in one of the states of a nonresident of the United States receives the protection of our laws. Why may not the privilege of receiving it by transfer or succession be taxed by some state at least of the United States? And if it may be so taxed, why may not such tax be assessed in the state of the actual or constructive situs of such property?

"Direct light is shed upon this question by the case of *Burnet* v. *Brooks,* 288 U. S. 378, 396, et seq. . . In an able and extended opinion, carefully reviewing and quoting copiously from previous decisions of the courts, it was held that said choses in action had a situs in the United States and consequently they might be subjected to a death duty tax by the Congress and that said fifth amendment set up no barrier to the collection of such a tax. It therefore seems self-evident that if said choses in action were property within the United States, they were at the same time property within the state of New York; also that if the fifth amendment did not forbid taxation of the transfer of said property by the United States, the fourteenth amendment should not forbid a similar tax, if imposed by the state of New York.

"Applying this reasoning to the case before us (stock in a domestic corporation), why may not the state of California tax the transfer of the property of a nonresident of the United States, which property has its actual or constructive situs within the jurisdiction of this state? To so hold, we encounter no question of the proper distribution of power between the states as the rights of no other state are involved. The question is: Has a state the power to tax the transfer of property within its boundaries, belonging to persons who were domiciled without the United States? The logic of the *Burnet* case, *supra,* seems to justify the right of the state of California to tax such a transfer."

In the case *In re Lloyd's Estate,* 185 Wash. 61, 52 P. (2d) 1269, the State of Washington levied a tax on bank deposits made in Seattle by Lloyd who died intestate and was domiciled in British Columbia. The Supreme Court of that State upheld the validity of the tax and said:

"The real and vital distinction between the two cases, however, is this: In the Lyons case, the decedent was a citizen of the United States, domiciled within its territory. In the instant case, the decedent was domiciled in a foreign country. No question affecting

international law, treaty rights, or reciprocity measures, is involved here. It is simply a question of the power of the state as limited by constitutional inhibitions.

"*      *      *      *      *      *      *

"But here we have a different state of facts, as already shown. No contest between states is possible. No disruption or conflict of feeling among them can occur. No state, other than the state of Washington, is here concerned. The advantage that might otherwise be lost by this state would not be gained by any other state. In short, the reason for the rule, built upon a legal fiction, does not exist, and therefore the rule has neither purpose nor efficacy in this case. To apply the rule in such a case as this, would be shaping the occasion to meet the rule instead of applying a rule to meet the circumstances. The cases cited from the United States supreme court and the *Lyons* case, as well, govern the power of the state in its relation with other states of the Union, but they are not applicable where relations between states are not involved.

"*      *      *      *      *      *      *

". . . Except for inhibitions growing out of the relations between the several states, and in the absence of some restraining rule of international law or agreement, there is no constitutional restriction upon the state's sovereign power to levy an inheritance tax."

The case of *Blodgett* v. *Silberman, supra,* on which the the appellees insistently rely, has not, in our opinion, the scope attributed to it. The only question involved therein was whether the State of Connecticut could validly levy an inheritance tax upon certain property left in New York by one Hirsch, who had died while domiciled in Connecticut. The property in question consisted of an interest or share in a business firm in New York, stock certificates of corporations, United States bonds and certificates of indebtedness, a savings account in a New York bank, and a life insurance policy with a company of New York. All the instruments evidencing such obligations had been kept in safe deposit boxes in New York and were never in Connecticut. It was held that, as intangible property was involved, the State of the testator's domicile could levy a succession tax, even though the instruments evidencing said property were kept

on deposit outside said State, and even though the transfer thereof were subject to taxation in another jurisdiction. The question whether the State of New York could levy a tax upon the transmission of said intangible property was not involved in the case. It was only held, applying the maxim *mobilia sequuntur personam*, that the State of Connecticut could impose it.

▮ In accordance with the decisions which we have examined, we must hold that the testamentary transmission of the intangible property above described, upon which there has been levied and collected the tax sought to be refunded, has been validly taxed, and that there has been no violation of any provision of the Federal Constitution or of the Organic Act of Puerto Rico.

We do not think that there is any merit in the contention of the plaintiffs-appellees, that the assessment and collection of the tax in question constitutes a violation of "the convention or treaty at present in force between the United States and France, prohibiting tax discrimination." The article thereof claimed to have been violated reads as follows:

"Art. 7. In all the States of the Union whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States. They shall be free to dispose of it as they may please, either gratuitously or for value received, by donation, testament or otherwise, just as those citizens themselves, *and in no case shall they be subjected to taxes on transfer, inheritance or any others different from those paid by the latter, or to taxes which shall not be equally imposed.*" Consular Convention 1853, art. 7. Treaties and Conventions, 1889, p. 350. Fed Stat. Ann., vol. 7, p. 551.

The French citizenship of the testatrix has nothing to do with the levying of the taxes sought to be refunded. Such taxes are not imposed either on the person or on the hereditary property as such. They are levied on the transmission of hereditary property located in Puerto Rico and owned by

a party domiciled in a foreign country. If the testatrix Mrs. Emanuelli had been an American citizen domiciled in France, the transmission by inheritance of the intangible property left by her in Puerto Rico would have been subject to the same inheritance tax collected in her case, which is that of a French citizen domiciled in France. As no tax has been levied different from that which is imposed on transfers of hereditary intangible property belonging to United States citizens, nonresidents of Puerto Rico and domiciled in a foreign country, it can not be contended that the plaintiffs have been discriminated against. If we held that the mere fact of the testatrix being a French citizen rendered the transmission of her estate exempt from the payment of the tax to which it would have been subject if she had been a citizen of the United States, we would be sanctioning a discrimination against our nonresident nationals and in favor of nonresident Frenchmen. Article 7, *supra*, confers on Frenchmen the right to claim equality before the law, but not the right to demand privileges not conferred by law on the citizens of this country.

The judgment appealed from must be reversed and another rendered instead dismissing the complaint, with costs against the plaintiffs-appellees, but without including attorney's fees.

Mr. Justice Snyder took no part in the decision of this case.

#### ON MOTION FOR REHEARING

#### February 18, 1942

MR. JUSTICE TRAVIESO delivered the opinion of the court.

On January 23, 1942, we rendered a judgment reversing the one entered by the District Court of Ponce on March 28, 1939, and dismissing the complaint.

The plaintiffs-appellees, through their counsel, have asked us in a lengthy motion to reconsider and reverse our judgment and to affirm instead that of the lower court.

We have given said motion most careful consideration because the question involved is one of extraordinary importance which has been raised for the first time in this jurisdiction, and because the deep study which counsel for the plaintiffs have made of the same deserves such special consideration. We have reached the conclusion that the reconsideration sought must be denied and our former judgment allowed to stand, not only on the grounds set forth in the opinion delivered in support thereof, but also on those which we will state presently.

The hereditary property on which the tax was levied and collected, although technically intangible, has its commercial situs in Puerto Rico. The special partner's contribution represents an investment of money in Puerto Rico, which produces interest that is sent abroad to the special partner. The same consideration applies to the current account balance held by the special partner in said firm. The $5,000 loaned and secured by mortgage on real estate lying in Puerto Rico yields interest which is remitted to the non-resident mortgagee to be expended outside the country producing the same.

All these investments of money made in Puerto Rico, at rates of interest higher than those usually paid in other countries, enjoy the protection of our government and of our laws. It seems fair that on being transmitted as hereditary property they should contribute, in a like measure as other investments of residents in this country, to the defrayal of the government's expenditures.

If the imposition of a succession tax on the transfer of bonds and stock of foreign governments and corporations belonging to a foreign decedent nonresident of the United States was upheld in *Burnet* v. *Brooks, supra,* and if the levying of a tax on stock certificates of a domestic corporation, belonging to an Englishman who at the time of his death was living in Great Britain, was valid, according to the decision in the case of *In re McCreery's Estate supra,* we fail to see

any legal or equitable reason or any constitutional objection that would compel us to declare invalid the collection of the inheritance tax in the case at bar. Moreover, it would seem to us to be unfair to the taxpayers residing in this country, were we to hold that a nonresident alien, merely because of the fact of his residence abroad, may enjoy the privilege of investing capital in Puerto Rico and receiving interest thereon, without his heirs being compelled to pay any tax on such capital when acquiring it by inheritance.

The motion for rehearing is denied.