## BURNET, COMMISSIONER OF INTERNAL REVENUE, v. BROOKS ET AL., EXECUTORS.

No. 496. Argued February 9, 1933.—Decided March 13, 1933.

Solicitor General Thacher, with whom Assistant Attorney General Youngquist and Messrs. Sewall Key and J. Louis Monarch were on the brief, for petitioner.

382

*Mr. Francis B. Hamlin,* with whom *Mr. Richard T. Greene* was on the brief, for respondents.

384

386

By leave of Court, briefs of *amici curiae* were filed by *Mr. Selden Bacon;* by *Mr. Edward N. Perkins;* and by *Messrs. Charles Angulo* and *Russell L. Bradford.*

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Respondents contested the determination of the Commissioner of Internal Revenue in including in the gross estate of decedent certain intangible property. Decedent, who died in October, 1924, was a subject of Great Britain and a resident of Cuba. He was not engaged in business in the United States. The property in question consisted of securities, viz., bonds of foreign corporations, bonds of foreign governments, bonds of domestic corporations and of a domestic municipality, and stock in a foreign corporation, and also of a balance of a cash deposit.[1] Some of the securities, consisting of a stock certificate and bonds, were in the possession of decedent's son in New York City, who

---

[1] The property was scheduled as follows:

| | |
|---|---:|
| (a) Bonds of foreign corporations and accrued interest.. | $24,384.97 |
| (b) Bonds of foreign governments and accrued interest.. | 55,610.49 |
| (c) Bonds of domestic corporations and accrued interest. | 460,315.32 |
| (d) Bonds of a domestic municipality and accrued interest...................................... | 15,073.57 |
| (e) Stock in a foreign corporation (Cuba)............. | 50,000.00 |
| (f) Cash on deposit with Lawrence Turnure & Company.. | 14,517.98 |

collected the income and placed it to the credit of decedent in a New York bank. Other securities were in the possession of Lawrence Turnure & Company in New York City, who collected the income and credited it to decedent's checking account, which showed the above mentioned balance in his favor. None of the securities was pledged or held for any indebtedness. Finding these facts, the Board of Tax Appeals decided that the property should not be included in the decedent's gross estate for the purpose of the Federal Estate Tax (22 B. T. A. 71), and the decision was affirmed by the Circuit Court of Appeals. 60 F. (2d) 890. This Court granted certiorari, 287 U. S. 594.

The provisions governing the imposition of the tax are found in the Revenue Act of 1924, c. 234, 43 Stat. 253, 303–307, and are set forth in the margin.[2] Two questions

---

[2] " Sec. 301. (a) In lieu of the tax imposed by Title IV of the Revenue Act of 1921, a tax equal to the sum of the following percentages of the value of the net estate (determined as provided in section 303) is hereby imposed upon the transfer of the net estate of every decedent dying after the enactment of this Act, whether a resident or nonresident of the United States: " (rates follow) . . .

" Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate; . . .

" Sec. 303. For the purpose of the tax the value of the net estate shall be determined—

"(a) In the case of a resident, by deducting from the value of the gross estate— . . .

"(b) In the case of a nonresident, by deducting from the value of that part of his gross estate which at the time of his death is situated in the United States—

"(1) That proportion of the deductions specified in paragraph (1) of subdivision (a) of this section which the value of such part bears to the value of his entire gross estate, wherever situated, but in no case shall the amount so deducted exceed 10 per centum of the value

are presented,—(1) whether the property in question is covered by these provisions, and (2) whether, if construed to be applicable, they are valid under the Fifth Amendment of the Federal Constitution. The decisions below answered the first question in the negative.

*First.* The first question is one of legislative intention. In the case of a nonresident of the United States, that part of the gross estate was to be returned and valued " which at the time of his death is situated in the United States." In interpreting this clause, regard must be had to the purpose in view. The Congress was exercising its taxing power. Defining the subject of its exercise, the Congress resorted to a general description referring to the situs of the property. The statute made no distinction between tangible and intangible property. It did not except intangibles. It did not except securities. Save as stated, it did not except debts due to a nonresident from

of that part of his gross estate which at the time of his death is situated in the United States; . . .

"(c) No deduction shall be allowed in the case of a nonresident unless the executor includes in the return required to be filed under section 304 the value at the time of his death of that part of the gross estate of the nonresident not situated in the United States.

".(d) For the purpose of Part I of this title, stock in a domestic corporation owned and held by a nonresident decedent shall be deemed property within the United States, . . .

"(e) The amount receivable as insurance upon the life of a nonresident decedent, and any moneys deposited with any person carrying on the banking business, by or for a nonresident decedent who was not engaged in business in the United States at the time of his death, shall not, for the purpose of Part I of this title, be deemed property within the United States. . . .

" Sec. 304. (a) .... The executor shall also, at such times and in such manner as may be required by regulations made pursuant to law, file with the collector a return under oath in duplicate, setting forth (1) the value of the gross estate of the decedent at the time of his death, or, in case of a nonresident, of that part of his gross estate situated in the United States; . . ."

resident debtors. As to tangibles and intangibles alike, it made the test one of situs, and we think it is clear that the reference is to property which, according to accepted principles, could be deemed to have a situs in this country for the purpose of the exertion of the Federal power of taxation. Again, so far as the intention of the Congress is concerned, we think that the principles thus impliedly invoked by the statute were the principles theretofore declared and then held. It is quite inadmissible to assume that the Congress exerting Federal power was legislating in disregard of existing doctrine, or to view its intention in the light of decisions as to State power which were not rendered until several years later.[3] The argument is pressed that the reference to situs must, as to intangibles, be taken to incorporate the principle of *mobilia sequuntur personam* and thus, for example, that the bonds here in question though physically in New York should be regarded as situated in Cuba where decedent resided. But the Congress did not enact a maxim. When the statute was passed it was well established that the taxing power could reach such securities in the view that they had a situs where they were physically located. As securities thus actually present in this country were regarded as having a situs here for the purpose of taxation, we are unable to say that the Congress in its broad description, embracing all property "situated in the United States," intended to exclude such securities from the gross estate to be returned and valued.

The general clause with respect to the property of nonresidents " situated in the United States " is found in the provisions for an Estate Tax of the Revenue Act of 1916, § 203 (b), 39 Stat. 778, and was continued in the Revenue

[3] The case of *Blackstone* v. *Miller*, 188 U. S. 189, was not overruled until 1930. See *Farmers' Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204, 209.

Acts of 1918, § 403 (b), 40 Stat. 1098; of 1921, § 403 (b),.
42 Stat. 280; and of 1924, § 303 (b), the provision now
under consideration. Before the phrase was used in the
Act of 1916, this Court, in passing upon questions arising
under the inheritance tax law of June 13, 1898, § 29,
30 Stat. 464 (in a case where the decedent had left "cer-
tain federal, municipal and corporate bonds" in the
custody of his agents in New York), recognized that the
property would not have escaped the tax, had it been
imposed in apt terms, in the view that the property was
intangible and belonged to a nonresident. *Eidman* v.
*Martinez*, 184 U. S. 578, 582. While that statute was
found to be inapplicable, as the property had not passed,
within the limitations of the statute, "by will or by the
intestate laws of any State or Territory," the opinion
conceded the power of Congress "to impose an inheri-
tance tax upon property in this country, no matter where
owned or transmitted." *Id.*, p. 592. We see no reason
to doubt that it was with this conception of its power that
the Congress enacted the later provisions for an estate tax
in the case of nonresidents. And before the Revenue Act
of 1921 was passed, we had stated the principles deemed
controlling, in *DeGanay* v. *Lederer*, 250 U. S. 376, in con-
struing the provision of the Income Tax Law of 1913,
38 Stat. 166, imposing a tax upon the net income "from
all property owned . . . in the United States by persons
residing elsewhere." The decision was upon a certified
question with respect to the income of a citizen and
resident of France from stocks, bonds, and mortgages
secured upon property in the United States, where the
owner's agent in the United States collected and remitted
the income and had "physical possession of the cer-
tificates of stock, the bonds and the mortgages." The
Court said,—"The question submitted comes to this: Is
the income from the stock, bonds and mortgages, held by

the Pennsylvania Company [the agent], derived from property owned in the United States? A learned argument is made to the effect that the stock certificates, bonds and mortgages, are not property; that they are but evidences of the ownership of interests which are property; that the property, in a legal sense, represented by the securities, would exist if the physical evidences thereof were destroyed. But we are of opinion that these refinements are not decisive of the congressional intent in using the term ' property ' in this statute. Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with a meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages and certificates of stock are regarded as property. By state and federal statutes they are often treated as property, not as mere evidences of the interests which they represent." Having no doubt " that the securities, herein involved, are property," the Court proceeded to the question,—"Are they property within the United States? It is insisted that the maxim *mobilia sequuntur personam* applies in this instance and that the situs of the property was at the domicile of the owner in France. But this Court has frequently declared that the maxim, a fiction at most, must yield to the facts and circumstances of cases which require it; and that notes, bonds and mortgages may acquire a situs at a place other than the domicile of the owner, and be there reached by the taxing authority." Then, describing the location of the certificates of stock, bonds and mortgages in question in the possession of the agent in Philadelphia, the Court concluded that the securities constituted " property within the United States within the meaning of Congress as expressed in the statute under consideration." The reference in the state-

ment of this conclusion to the authority of the agent to sell, invest and reinvest was by way of emphasis, and is not to be taken as importing a necessary qualification. The Court answered the certified question in the affirmative. *Id.*, pp. 380–383.

Under the Revenue Act of 1916, the Commissioner of Internal Revenue ruled " that Congress has the power and evidenced an intention " in that act " to impose a tax upon bonds, both foreign and domestic, owned by a non-resident decedent, which bonds are physically situate in the United States " and that " such bonds must be returned as a portion of his gross estate." T. D. 2530. The regulations promulgated by the Treasury Department under the Revenue Act of 1918, interpreting the words "situated in the United States," contained the following: ". The situs of property, both real and personal, for the purpose of the tax is its actual situs. Stock in a domestic corporation, and insurance payable by a domestic insurance company, constitute property situated in the United States, although owned by, or payable to, a nonresident. A domestic corporation or insurance company is one created or organized in the United States. Bonds actually situated in the United States, moneys on deposit with domestic banks and moneys due on open accounts by domestic debtors constitute property subject to tax." Regulations No. 37, Art. 60, T. D. 2378, 2910, 3145. This provision, in substance, as to bonds and moneys due (other than insurance moneys and bank deposits, which were made the subject of a special statutory provision), was repeated in the regulations under the Revenue Act of 1921, as follows: " Bonds actually within the United States, moneys due on open accounts by domestic debtors, and stock of a corporation or association created or organized in the United States, constitute property having its situs in the United States." Regulations No. 63, Art. 53, T. D. 3384. We find no ground for questioning the inten-

tion of the Congress, when in the Revenue Act of 1924 it reënacted the provision as to the property of nonresidents "situated in the United States," to impose the tax with respect to bonds physically within the United States and stock in domestic corporations. *Brewster* v. *Gage,* 280 U. S. 327, 337.

The argument is pressed that the regulations above quoted are silent as to stock owned by nonresidents in foreign corporations when the certificates of stock are held within the United States. We think that the omission is inconclusive. It may be more fairly said that the express terms of these regulations did not go far enough, rather than that, so far as they did go, they failed to express the legislative intent. In the view which identifies the property interest with its physical representative, no sufficient reason appears for holding that bonds were intended to be included, and not certificates of stock, if these were physically in the United States at the time of death. See *DeGanay* v. *Lederer, supra; Disconto-Gesellschaft* v. *U. S. Steel Corp.,* 267 U. S. 22, 28, 29. The regulations adopted under the Revenue Act of 1924 expanded the provision as to the "situs of property of nonresident decedents" so as to include stock in foreign corporations when the certificates were held here, by providing: "Real estate within the United States, stocks and bonds physically in the United States at date of death, moneys due on open accounts by domestic debtors, and stock of a corporation or association created or organized in the United States, constitute property having a situs in the United States." Regulations No. 68, Art. 50, T. D. 3683. The Revenue Act of 1926, § 303 (b), 44 Stat. 73, reënacted the provision as to property of nonresidents "situated in the United States," and the regulation under that Act expressly embraces "certificates of stock, bonds, bills, notes, and mortgages, physically in the United States at date of death" as property "having a situs in the United States,"

in addition to the clause relating to stock of domestic corporations. Regulations No. 70, Art. 50. And these provisions have been continued. *Id.* 1929 edition.

We do not find that the qualifying provisions of §§ 303 (d) and (e) of the Revenue Act of 1924 are inconsistent with the departmental construction. Section 303 (d) provided that "stock in a domestic corporation owned and held by a nonresident decedent shall be deemed property within the United States." Respondents point to the absence of a similar provision as to bonds and as to stock in foreign corporations, and invoke the maxim *expressio unius est exclusio alterius.* But the argument seems to prove too much. It is not to be supposed that the Congress intended that stock owned by a nonresident in a domestic corporation, where the certificates of stock were held in the United States, were to be subject to the tax, and that bonds of the same corporation similarly owned and physically in the United States, were to be excepted. See T. D. 2530. We think that the Government's construction of the provision is the more reasonable one; that the place where the stock was held was not an element in the application of § 303 (d), and that this provision was designed to insure the inclusion of the stock of a domestic corporation in all cases, whether the certificates were physically present in the United States or not. Compare *Corry* v. *Baltimore,* 196 U. S. 466, 473, 474.

Section 303 (e) provided: "The amount receivable as insurance upon the life of a nonresident decedent, and any moneys deposited with any person carrying on the banking business, by or for a nonresident decedent who was not engaged in business in the United States at the time of his death," are not to be deemed "property within the United States." The Revenue Act of 1918, § 403 (b) (3), had provided that the amount receivable as insurance, where the insurer is a domestic corporation, should be regarded

as property within the United States, and this was repealed by the substituted provision of the Revenue Act of 1921, § 403 (b) (3), to the contrary effect, the latter being carried forward in the Revenue Act of 1924. It is a matter of common knowledge that American life insurance companies were engaged in business abroad, and no clear inference with respect to the question now under consideration may be drawn either from the original provision or from its repeal.[4] But the significance of the remaining clause of the Act of 1921, reënacted in 1924, is apparent. This provided for the exclusion from the gross estate of bank deposits in this country, in the circumstances stated, of deposits which, as constituting property of nonresidents situated in the United States, had theretofore been subject to the estate tax.[5] The Congress evidently thought it necessary to make this express exception, in order to exclude such deposits from the tax, but did not provide any exception with respect to bonds and certificates of stock physically here.

As to decedent's deposit balance in the instant case, the Board of Tax Appeals did not make an explicit finding that Lawrence Turnure & Company, with whom the decedent had a checking account, was "carrying on the banking business." The Board thought that the point was not material. 22 B. T. A. p. 87. If that firm was engaged in the banking business, the statute required the exclusion of the deposit balance from the gross estate. As to the securities, in view of the legislative history and departmental construction, we find no basis for holding that the statute, if valid in this application, did not require their inclusion.

---

[4] See House Rep. No. 767, 65th Cong., 2d Sess., p. 22; Sen. Rep. No. 275, 67th Cong., 1st sess., p. 25; House Rep. No. 350, 67th Cong., 1st sess., p. 15.

[5] See Sen. Rep. No. 275, 67th Cong., 1st sess., p. 25.

*Second.* The question of power to lay the tax. As a nation with all the attributes of sovereignty, the United States is vested with all the powers of government necessary to maintain an effective control of international relations. *Fong Yue Ting* v. *United States,* 149 U. S. 698, 711; *Knox* v. *Lee,* 12 Wall. 457, 555, 556. "We should hesitate long," we said in *Mackenzie* v. *Hare,* 239 U. S. 299, 311, "before limiting or embarrassing such powers." So far as our relation to other nations is concerned, and apart from any self-imposed constitutional restriction, we cannot fail to regard the property in question as being within the jurisdiction of the United States,—that is, it was property within the reach of the power which the United States by virtue of its sovereignty could exercise as against other nations and their subjects without violating any established principle of international law. This view of the scope of the sovereign power in the matter of the taxation of securities physically within the territorial limits of the sovereign is sustained by high authority and is a postulate of legislative action in other countries. The subject was considered by the House of Lords in *Winans* v. *Attorney-General,* [1910] A. C. 27. The question was as to the liability to estate duty, under the British Finance Act, 1894, of bonds and certificates when these were physically situated in the United Kingdom at the death of the owner, who was a citizen of the United States and domiciled here. The securities were payable to bearer, marketable on the London Stock Exchange, and passed by delivery. The executors insisted that "the property did not pass by the law of the United Kingdom but by the law of the deceased's domicile"; that "the presence in the United Kingdom of the documents of title to the property did not create a liability to estate duty"; that "all the debtors on the bonds and certificates were at the time of the death and all material times outside the

United Kingdom and beyond its jurisdiction "; that " the marketability of a piece of paper in the United Kingdom was not sufficient to make the debt of which it was evidence liable to estate duty "; and that " the property was not situate in the United Kingdom." The House of Lords was not convinced by these contentions. The Lord Chancellor observed that " the property received the full protection of British laws—which is a constant basis of taxation—and can only be transferred from the deceased to other persons by the authority of a British Court." *Id.*, p. 30. Lord Atkinson referred to the status of the securities under international law. " Being physically situated in England at the time of their owner's death," said his Lordship, " they were subject to English law and the jurisdiction of English Courts, and taxes might therefore *prima facie* be leviable upon them. . . . There does not appear, a priori, to be anything contrary to the principles of international law, or hurtful to the polity of nations, in a State's taxing property physically situated within its borders, wherever its owner may have been domiciled at the time of his death." *Id.*, p. 31. And Lord Shaw of Dunfermline summed up the application of the British acts as follows: " In the case of an English citizen all his property ' wheresoever situate,' subject to the exception in the Act, is aggregated, and into that aggregation—to confine oneself to the matter in hand—all personal property situate out of the United Kingdom must come, unless legacy or succession duty would not have been payable in respect thereof. In the case of the foreign citizen no taxation, of course, falls, except upon property situate within the United Kingdom, and I know no reason either under the law of nations, by the custom of nations, or in the nature of things why property within the jurisdiction of this country, possessed and held under the protection of its laws, should not, upon transfer from

the dead to the living, pay the same toll which would have been paid by property enjoying the same protection but owned by a deceased British subject." *Id.*, pp. 47, 48. In this view, the securities were held to be subject to the estate duty.[6]

In *Disconto-Gesellschaft* v. *U. S. Steel Corp.*, 267 U. S. 22, a somewhat analogous question of jurisdiction arose in relation to the title to shares of stock of an American corporation, which were owned by German corporations, and the certificates of which had been seized in London by the British Public Trustee appointed to be custodian of enemy property during the late war. As was found to be usual with shares which it was desired to deal in abroad, the shares had been registered on the books of the American corporation in the name of an English broker or dealer who had endorsed the certificates in blank. The German corporations had bought the shares and held the certificates in London. Their suit here was to establish title, to cancel outstanding certificates and to have new certificates issued to them. They based their claim on the proposition that seizure of the certificates in Great Britain did not constitute a seizure of the shares; that the presence of the certificates did not bring the shares within the territorial jurisdiction of Great Britain. This Court took a different view and sustained the title of the British Public Trustee. The Court thus stated the basis of its ruling: " New Jersey having authorized this corporation like others to issue certificates that so far represent the stock that ordinarily at least no one can get the benefits of ownership except through and by means of the paper, it recognizes as owner anyone to whom the person declared

---

[6] See, also, as to taxation in Italy, U. S. Department of Commerce's pamphlet entitled " Taxation of Business in Italy," Trade Promotion Series—No. 82 (1929); sub tit. " Tax on Successions," p. 105; as to taxation in France, see " French Fiscal Legislation," Neurrisse and Bezoz (1928), pp. 151–153.

by the paper to be owner has transferred it by the indorsement provided for, wherever it takes place. It allows an indorsement in blank, and by its law as well as by the law of England an indorsement in blank authorizes anyone who is the lawful owner of the paper to write in a name, and thereby entitle the person so named to demand registration as owner in his turn upon the corporation's books. But the question who is the owner of the paper depends upon the law of the place where the paper is. It does not depend upon the holder's having given value or taking without notice of outstanding claims but upon the things done being sufficient by the law of the place to transfer the title. An execution locally valid is as effectual as an ordinary purchase. *Yazoo & Mississippi Valley R. Co.* v. *Clarksdale*, 257 U. S. 10. The things done in England transferred the title to the Public Trustee by English law." The Court thought it "so plain that the Public Trustee got a title good as against the plaintiffs by the original seizure" that it was deemed unnecessary to advert to the treaties upon which the Public Trustee also relied or upon the subsequent dealings between England and Germany. *Id.*, pp. 28, 29.

As jurisdiction may exist in more than one government, that is, jurisdiction based on distinct grounds—the citizenship of the owner, his domicile, the source of income, the situs of the property—efforts have been made to preclude multiple taxation through the negotiation of appropriate international conventions. These endeavors, however, have proceeded upon express or implied recognition, and not in denial, of the sovereign taxing power as exerted by governments in the exercise of jurisdiction upon any one of these grounds. For many years this subject has been under consideration by international committees of experts, and drafts of conventions have been proposed, the advantages of which lie in the mutual concessions or reciprocal restrictions to be voluntarily made or accepted

by Powers freely negotiating on the basis of recognized principles of jurisdiction.[7] In its international relations, the United States is as competent as other nations to enter into such negotiations, and to become a party to such conventions, without any disadvantage due to limitation of its sovereign power, unless that limitation is necessarily found to be imposed by its own Constitution.

Respondents urge that constitutional restriction precluding the federal estate tax in question is found in the due process clause of the Fifth Amendment. The point, being solely one of jurisdiction to tax, involves none of the other considerations raised by confiscatory or arbitrary legislation inconsistent with the fundamental conceptions of justice which are embodied in the due process clause for the protection of life, liberty and property of all persons—citizens and friendly aliens alike. *Russian Volunteer Fleet* v. *United States*, 282 U. S. 481, 489; *Nichols* v. *Coolidge*, 274 U. S. 531, 542; *Heiner* v. *Donnan*, 285 U. S. 312, 326. If in the instant case the Federal Government had jurisdiction to impose the tax, there is manifestly no ground for assailing it. *Knowlton* v. *Moore*, 178 U. S. 41, 109; *McCray* v. *United States*, 195 U. S. 27, 61; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 153, 154; *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 24; *United States* v. *Doremus*, 249 U. S. 86, 93. Respondents' reliance is upon the decisions of this Court with respect to the limitation of the taxing power of the States under the due process

[7] Puolication entitled "*Double Taxation Relief*," Bureau of Foreign and Domestic Commerce, Department of Commerce (January, 1928), pp. 20, 21; "*Double Taxation and Tax Evasion*," Report of the General Meeting of Government Experts to League of Nations, Document C. 562, M. 178, 1928, II, 49, pp. 22–24; Fifth General Congress, International Chamber of Commerce, Amsterdam, 1929, Resolution No. 1, Annex, p. 11; Washington Congress, 1931, International Chamber of Commerce, Resolution No. 10, pp. 20–22. See also, "*Taxation of Foreign and National Enterprises*," (League of Nations, Geneva, 1932).

clause of the Fourteenth Amendment. *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204; *Baldwin* v. *Missouri,* 281 U. S. 586; *Beidler* v. *South Carolina Tax Commission,* 282 U. S. 1; *First National Bank* v. *Maine,* 284 U. S. 312. They insist that the like clause of the Fifth Amendment imposes a corresponding restriction upon the taxing power of the Federal Government.

The argument is specious, but it ignores an established distinction. Due process requires that the limits of jurisdiction shall not be transgressed. That requirement leaves the limits of jurisdiction to be ascertained in each case with appropriate regard to the distinct spheres of activity of State and Nation. The limits of State power are defined in view of the relation of the States to each other in the Federal Union. The bond of the Constitution qualifies their jurisdiction. This is the principle which underlies the decisions cited by respondents. These decisions established that proper regard for the relation of the States in our system required that the property under consideration should be taxed in only one State and that jurisdiction to tax was restricted accordingly. In *Farmers Loan & Trust Co.* v. *Minnesota, supra,* the Court applied the principle to intangibles, and referring to the contrary view which had prevailed, said (p. 209): " The inevitable tendency of that view is to disturb good relations among the States and produce the kind of discontent expected to subside after establishment of the Union. The Federalist, No. VII. The practical effect of it has been bad; perhaps two-thirds of the States have endeavored to avoid the evil by resorting to reciprocal exemption laws." It was this " rule of immunity from taxation by more than one State," deducible from the decisions in respect of various and distinct kinds of property, that the Court applied in *First National Bank* v. *Maine, supra,* p. 326.

As pointed out in the opinion in the *First National Bank* case, the principle has had a progressive application.

In *Louisville & Jeffersonville Ferry Co.* v. *Kentucky,* 188 U. S. 385, the question related to a ferry franchise granted by Indiana to a Kentucky corporation, which Kentucky attempted to tax. Despite the fact that the tax was laid upon a property right belonging to a domestic corporation, the Court held that the Fourteenth Amendment precluded the imposition. *Id.,* p. 398. In *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, the principle was applied to the attempted taxation by Kentucky of tangible personal property which was owned by a domestic corporation but had a permanent situs in another State. The Court decided that where tangible personal property had an actual situs in a particular State, the power to subject it to state taxation rested exclusively in that State regardless of the domicile of the owner. By *Frick* v. *Pennsylvania,* 268 U. S. 473, the rule became definitely fixed that as to tangible personal property the power to impose a death transfer tax was solely in the State where the property had an actual situs, and could not be exercised by another State where the decedent was domiciled. See *First National Bank* v. *Maine, supra,* p. 322. The decision in *Farmers Loan & Trust Co.* v. *Minnesota, supra,* overruling *Blackstone* v. *Miller,* 188 U. S. 189, carried forward the principle by applying it to intangibles. The Court was of the opinion that " the general reasons declared sufficient to inhibit taxation of them [tangibles] by two States apply under present circumstances with no less force to intangibles with taxable situs imposed by due application of the legal fiction. Primitive conditions have passed; business is now transacted on a national scale. A very large part of the country's wealth is invested in negotiable securities whose protection against discrimination, unjust and oppressive taxation is matter of the greatest moment." 280 U. S. pp. 211, 212.

But it has been as decisively maintained that this principle, thus progressively applied in limiting the jurisdiction of the States to tax, does not restrict the taxing power of the Federal Government. The distinction was clearly and definitely made in *United States* v. *Bennett,* 232 U. S. 299. The question arose under § 37 of the Tariff Act of August 5, 1909, 36 Stat. 112, imposing a tax upon the use of foreign-built yachts, owned or chartered by citizens of the United States. The levy of the tax with respect to a yacht owned by a citizen of the United States, domiciled here, but which was not used within the jurisdiction of the United States and had its permanent situs in a foreign country, was resisted under the due process clause of the Fifth Amendment. The objector invoked the doctrine, already established, which denied to a State, under the Fourteenth Amendment, jurisdiction to tax personal property which had a permanent situs in another State. *Union Refrigerator Transit Co.* v. *Kentucky, supra.* Under that doctrine, as we have seen, it made no difference that the owner of the property was a citizen of, or domiciled in, the State which attempted to lay the tax. The argument was pressed that the Federal statute should not be so construed as to apply to the use of a yacht wholly beyond the territorial limits of the United States, since if so interpreted it would be repugnant to the Constitution. But the Court thought that to apply that rule of interpretation would be to cause "an imaginary doubt" as to the constitutionality of the statute, and would render it necessary to give the statute "a wholly fictitious and unauthorized meaning." We found nothing "of such gravity in the asserted constitutional question" as to justify departing from the evident legislative intention. Speaking through Chief Justice White, and fully recognizing the principle applicable to the taxing power of the States, the Court observed

that the argument involved a misapprehension, not as to what had actually been decided, but "in taking for granted that because the doctrine stated has been applied and enforced in many decisions with respect to the taxing power of the States, that the same principle is applicable to and controlling as to the United States in the exercise of its powers." "The confusion results"—the Court continued—"from not observing that the rule applied in the cases relied upon to many forms of exertion of state taxing power is based on the limitations on state authority to tax resulting from the distribution of powers ordained by the Constitution. In other words, the whole argument proceeds upon the mistaken supposition, which is sometimes indulged in, that the calling into being of the government under the Constitution, had the effect of destroying obvious powers of government instead of preserving and distributing such powers. The application to the States of the rule of due process relied upon comes from the fact that their spheres of activity are enforced and protected by the Constitution and therefore it is impossible for one State to reach out and tax property in another without violating the Constitution, for where the power of the one ends the authority of the other begins." "But this," the Court added, "has no application to the Government of the United States so far as its admitted taxing power is concerned," for that power "embraces all the attributes which appertain to sovereignty in the fullest sense. . . . Because the limitations of the Constitution are barriers bordering the States and preventing them from transcending the limits of their authority and thus destroying the rights of other States and at the same time saving their rights from destruction by the other States, in other words of maintaining and preserving the rights of all the States, affords no ground for constructing an imaginary constitutional barrier

around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *Id., pp.* 305, 306.

This distinction between the limitations of state jurisdiction to tax and the broad authority of the Federal Government, was restated and applied in *Cook* v. *Tait*, 265 U. S. 47, 55, 56, and was again explicitly recognized in *Frick* v. *Pennsylvania, supra,* p. 491.

The distinction cannot be regarded as limited to tangible property. It has equal application to intangibles. It does not rest upon the question whether the property is of the one sort or the other, but upon the fact that the limitation of state jurisdiction to tax does not establish the limitation of federal jurisdiction to tax. If the Federal Government may rest its jurisdiction to lay its tax upon the fact of the citizenship and domicile in this country of the owner of tangible property, wherever that property may be situated, although the State may not impose a like tax with respect to property having a permanent location outside the State, the Federal Government cannot be regarded as restrained in its power to tax securities owned by a nonresident, but physically in this country, merely because the State is debarred from laying such a tax with respect to a nonresident of the State. The decisive point is that the criterion of state taxing power by virtue of the relation of the States to each other under the Constitution is not the criterion of the taxing power of the United States by virtue of its sovereignty in relation to the property of nonresidents. The Constitution creates no such relation between the United States and foreign countries as it creates between the States themselves.

Accordingly, in what has been said, we in no way limit the authority of our decisions as to state power. We

determine national power in relation to other countries and their subjects by applying the principles of jurisdiction recognized in international relations. Applying those principles we cannot doubt that the Congress had the power to enact the statute, as we have construed and applied it to the property in question. The securities should be included in the gross estate of the decedent; the inclusion of the balance of the cash deposit will depend, under the statute, upon the finding to be made with respect to the nature of the business of the concern with which the deposit was made.

The judgment is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE BUTLER is of opinion that the statute does not extend to the transfer of the foreign or other securities effected by the death of decedent, Ernest Augustus Brooks, a British subject resident of and dying in Cuba, and that the conclusions of the Board of Tax Appeals and Circuit Court of Appeals are right and should be affirmed.