CURT E. PULVERMANN, A BENEFICIARY OF THE ESTATE OF EDUARD F. PULVERMANN, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63087.   Filed May 12, 1958.

*Raoul Berger, Esq.*, for the petitioner.
*George J. Rabil, Esq.*, for the respondent.

#### OPINION.

MULRONEY, *Judge:* The respondent determined estate tax in the sum of $17,199.32 as due from petitioner, Curt E. Pulvermann, as a beneficiary of, and transferee of, the Estate of Eduard F. Pulvermann, Deceased.

The questions presented are whether certain bonds of a New Jersey corporation were situated in the United States at the time a nonresident alien decedent died or at the time said decedent made a revocable transfer of the bonds to petitioner.

All of the facts were stipulated and are found accordingly.

Eduard F. Pulvermann, hereinafter called decedent, was a citizen and resident of Hamburg, Germany, and his son, Curt E. Pulvermann, petitioner here, is a resident of Argentina and has been such resident of Argentina since 1932.   Decedent owned bearer bonds of the face value of $119,000 of Markt & Hammacher Company, a New Jersey corporation, with its principal office at New York, New York.   On July 22, 1933, decedent wrote a letter to Markt & Hammacher Company in New York asking said company to register these bonds in the name of his son, Curt Pulvermann, and in the course of the letter stated, "I reserve for me all rights to dispose of them as I like, cash Bond interest etc."   Markt & Hammacher Company replied by letter to decedent dated September 22, 1933, advising decedent his bonds were unregistered and since they were bearer bonds "it is a very simple matter to transfer same to your son by merely handing them over to him or have them deposited in his name in any safe-deposit company."

In what purports to be a codicil of decedent's will dated May 1943, there is a statement over decedent's signature as follows: "I transferred to him [Curt Pulvermann], in 1930, as a gift, my 119 $ bonds

of Markt & Hammacher Co., which have a nominal value of $119,000."

By a letter dated November 11, 1933, the decedent, in connection with a proposed readjustment of the bond debt of Markt & Hammacher Company, involving an exchange by the holders of said bonds of seven-tenths thereof for new income bonds, mailed the $119,000 of bonds above mentioned to the office of Markt & Hammacher Company, New York, New York. The receipt of these bonds by Markt & Hammacher Company was acknowledged by letter to decedent dated January 26, 1934.

New bonds were issued pursuant to the proposed readjustment and kept in the New York office of Markt & Hammacher Company until 1937 when decedent came to New York and took the bonds from Markt & Hammacher Company and deposited them in a safe in the office of Markt & Company (London) Ltd. Prior to World War II decedent went to the office of Markt & Company (London) Ltd. and clipped the coupons from the bonds and used the proceeds.

In April 1941 these bonds were destroyed in an air raid bombing attack on London. Decedent was arrested by the Nazi Government in 1941 and in the course of the trial or investigation he made a statement in his own handwriting to the district attorney of Hamburg in which he stated that he had turned over the bonds heretofore described to his son about 1930 and that he kept them for his son in his custody. He was charged with various offenses from then on, including charges of having a secret broadcasting sender on his farm and violating the Currency Exchange Laws and was later incarcerated in the Fuhlsbuttel Concentration Camp until a few days before his death in April 1944 in the Langenhorn Hospital.

On April 5, 1943, the Alien Property Custodian, acting under the Trading With the Enemy Act and proper vesting orders, took over the property of Eduard F. Pulvermann and on May 29, 1943, the Alien Property Custodian made demand on Markt & Hammacher Company for the bonds destroyed in the air raid. The bonds were reissued to the Alien Property Custodian on November 1, 1944, and subsequently sold. On April 29, 1949, petitioner filed a claim with the Alien Property Custodian for a return of the proceeds of the sale of the bonds to him, alleging his father had given the bonds to him in 1932. This claim was subsequently allowed. In 1954 the Alien Property Custodian made a return to the petitioner of $102,075.95 after impounding the sum of $18,354.12 as a reserve for Federal estate taxes which might be due by the estate of decedent, which reserve has been and is now being held by the Office of Alien Property, Department of Justice. By notice of deficiency dated March 26, 1956, respondent advised petitioner as beneficiary and transferee of decedent's estate of the assessment of the deficiency in estate tax, as previously set forth; the entire deficiency being based

on the inclusion of the bonds as a part of decedent's estate as property situated in the United States at the time of decedent's death or at the time of the gift of the bonds to petitioner.

The question as to the liability of decedent's estate for estate tax is to be determined "as though the property or interest had not been vested in or transferred to the Alien Property Custodian, and shall be paid only out of the property or interest, * * * acquired from the * * * former owner, or earnings, increment, or proceeds thereof." Sec. 36 (b), Trading With the Enemy Act. In section 24 (b) of the Trading With the Enemy Act it is provided in part as follows:

In the case of * * * estate taxes imposed by any Act of Congress, the amount thereof shall, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, be computed in the same manner * * * as though the money or other property had not been seized by or paid to the Alien Property Custodian, * * *

The Commissioner's regulations, implementing the above statute, provide, in general, for tentative computations of tax in case property is being returned and the impounding of a sum to pay such tentative computation. Rev. Rul. 54–594, 1954–2 C. B. 10, making T. D. 4168 applicable to World War II.

From the above it will be seen no question of transferee liability is involved. The Alien Property Custodian has ruled petitioner is entitled to the proceeds received from the sale of the bonds and he has turned over those proceeds, less the tentative amount of estate tax which he impounded to pay the tax if it is found to be due. It also appears from the above-quoted statutes that, for the purpose of determining the estate tax due from decedent's estate, the seizure of the property of decedent by the Alien Property Custodian is to be disregarded. Respondent recognizes this for in his brief he states:

However, it has long been established that § 36 of the Trading With The Enemy Act provides, for tax purposes, to disregard the vesting of the interest of the decedent in the Custodian * * *

Section 861 (a) of the Internal Revenue Code of 1939 provides for the inclusion in the gross estate of every nonresident alien decedent, for the purposes of the United States estate tax, "that part of his gross estate * * * which at the time of his death is situated in the United States." Section 862 (b) of the Internal Revenue Code of 1939 provides that if the nonresident alien decedent has made a revocable transfer or a transfer in contemplation of, or taking effect at, death, then the property so transferred "shall be deemed to be situated in the United States, if so situated either at the time of the transfer, or at the time of the decedent's death."

The words of the statute "situated in the United States" mean having a *situs* in the United States. *Burnet* v. *Brooks*, 288 U. S. 378;

*Herman A. Holsten*, 35 B. T. A. 568, affirmed per curiam 93 F. 2d 1002; *Estate of Jose M. Tarafa y Armas*, 37 B. T. A. 19; *Delaney* v. *Murchie*, 177 F. 2d 444.

In *Burnet* v. *Brooks, supra*, the deceased nonresident alien had left securities consisting partly of bonds of domestic and foreign corporations with his son in the United States who collected the interest and placed it to the credit of decedent in a New York bank. In holding such securities includible for tax, the Court said:

The first question is one of legislative intention. In the case of a nonresident of the United States, that part of the gross estate was to be returned and valued "which at the time of his death is situated in the United States." In interpreting this clause, regard must be had to the purpose in view. The Congress was exercising its taxing power. Defining the subject of its exercise, the Congress resorted to a general description referring to the situs of the property. * * *

The opinion in *Burnet* v. *Brooks, supra*, goes on to say the statute made no distinction between tangible and intangible property and as to both "it made the test one of situs." The opinion then points out:

When the statute was passed it was well established that the taxing power could reach such securities in the view that they had a situs where they were physically located. * * *

The opinion quotes Treasury regulations to the effect that "[b]onds actually situated in the United States, * * * constitute property subject to the tax" and the holding is:

As to the securities, in view of the legislative history and departmental construction, we find no basis for holding that the statute, * * * did not require their inclusion.

Respondent's Regulations 105, section 81.50 of the Estate Tax Regulations, provide, in part:

the written evidence of intangible personal property which is treated as being the property itself [is] within the United States if physically situated therein. For example, a bond for the payment of money is not within the United States unless physically situated therein. * * *

The plain wording of the statute would seem to require the physical presence of the bonds in the United States before they could be included for tax as "property situated in the United States." In *Herman A. Holsten, supra*, we called attention to the statute (now section 862 (a), I. R. C. 1939) that made stock in a domestic corporation, owned by a nonresident alien, includible wherever located and then stated the evident legislative intent in the following language:

A careful reading of the statute shows that Congress intended to use a different basis for tax determination in the case of a nonresident alien decedent. It selected as a method of establishing that basis, the test of situs of property in the United States; except that stock in a domestic corporation, owned and held by a nonresident, was required to be included, regardless of situs. It would

have been easy, if Congress had wished, to require the inclusion as well, of bonds issued by domestic corporations. This it did not do, and the special provision regarding stocks, is, in itself, evidence of intent to treat bonds as in a separate class, and to require their inclusion only when they are actually, physically situated in the United States.

We think the question in this case is whether the bonds were includible in decedent's estate. Since they were not physically present in the United States at the time of decedent's death, that question is, under the plain intendment of the statute, answered in favor of petitioner. The bonds were not "property situated in the United States" at the time of decedent's death.

Respondent states the question in the case is: "Is a claim for destroyed bonds of a domestic corporation properly includible in the estate of a nonresident alien decedent as properly situated in the United States within the meaning of sections 811, 861 and 862 (b) of the Internal Revenue Code of 1939 ?"

Respondent's contention on brief is that after the bonds were destroyed in 1941 decedent was left with "a claim * * * for the issuance of new bonds in lieu of the bonds destroyed" and this claim, which had never been satisfied in decedent's lifetime had a situs in the United States.[1] Respondent likens this claim for the issuance of new bonds to a "chose in action" and he cites another part of his Regulations 105, sec. 81.50, to the effect that:

Intangible personal property the written evidence of which is not treated as being the property itself constitutes property within the United States if consisting of a property right issuing from or enforceable against a resident of the United States or a domestic corporation * * *

From the above it will be seen respondent bases his whole argument that the bonds had a situs in the United States, on the ground that the action for the issuance of the new bonds would have to be brought in the United States.

Respondent misconceives the nature of the claim or action for the reissuance of bonds that have been destroyed. Such an action is not to be considered "intangible personal property" and it is not a "chose in action" in the sense that it is a debt or a claim for money arising under a contract. It is merely an equitable cumulative remedy which the owner of bonds that were destroyed might or might not care to assert. It is not an action for any wrong or breach of contract committed by the defendant in the action. It is an action to enforce an equitable right at plaintiff's expense and it has been said it is somewhat analogous to an action to quiet title. *Nicholson* v. *Nicholson*, 67 Mont. 517, 216 Pac. 328. The destruction

---

[1] It fairly appears from certain documents in evidence that decedent probably never learned of the destruction of the bonds in the London air raid. These documents show decedent was first arrested by the Nazi government in the spring of 1941 and he remained almost continuously in custody until his death.

of the bonds does not affect their validity or legal effect and the liability of the parties remains the same except as the destruction of the bonds may occasion some difficulty of proof. The obtaining of duplicates is not a condition precedent to the enforcement of the obligations embodied in the bonds in an action upon a lost instrument. Respondent cannot ground an argument of bond situs in the United States upon the fact that one remedy, which may or may not be asserted in court, would have to be brought in the United States.

A bond obligation which is really an intangible is, by common usage, considered a tangible because the evidence of the obligation, namely the bond, is considered the property itself. *Burnet* v. *Brooks*, *supra*. This consideration has led to the rule that applies to other chattels, that the situs of the bond is where it is physically present. It is not quite true that the situs of a chattel is always where it is physically present. If the owner of the chattel has no intention to make the place where the chattel is physically present an abiding place with some degree of permanence, the former situs of the chattel will not shift.

In the case of *Delaney* v. *Murchie, supra*, an alien woman died in the United States during a temporary stopover in the course of a journey from one foreign country to another and it was held her jewelry and personal effects, which she had with her at the time of her death, were not property "situated in the United States" at the time of her death within the meaning of section 861, *supra*. The question in the cited case was a little different for there the chattels were physically present in the United States when the alien died and the question was whether the mere presence of the chattels was sufficient. The court held it was not, saying:

> It is clear from a long line of decided cases that the situs of a chattel has not been deemed to be determined by its mere physical presence at a given place on the tax day. Upon the contrary, the concept involves some degree of permanence, an established abiding place or home base for the chattel, analogous to the notion of domicil as applied to the person. * * *

The opinion points out:

> Her intention, which remained unchanged, and which was frustrated only by her death, was to carry these personal effects along with her to her home in Nassau.

Paraphrasing the last quotation from the *Murchie* case, it can be said here that decedent's intention, which remained unchanged and which was frustrated only by the destruction of the bonds in the London air raid, was to leave the bonds in England. Chief Judge Magruder, the author of the opinion in the *Murchie* case, drew support for his conclusion that the situs did not shift by temporary

absence from the original situs, from this statement of Justice Holmes, in *N. Y. Central Railroad* v. *Miller*, 202 U. S. 584, 597:

Using the language of domicil, which now so frequently is applied to inanimate things, the state of origin remains the permanent situs of the property, notwithstanding its occasional excursions to foreign parts. * * *

The holding in the *Murchie* case is in effect that situs did not shift to the United States when there was no intent to make the United States the situs of the property. So, too, do we hold the situs of the bonds did not shift to the United States merely as a consequence of their destruction.

Actually, the temporary absence of the bonds from England was about all that occurred here because of the fact that they were replaceable by new bonds of the same validity and legal effect. As pointed out earlier, the claim for replacement bonds is an equitable one and, given the stipulated facts of ownership before destruction and the fact of destruction, the claim for replacement was absolute. The equitable maxim to apply is that "equity regards as done that which ought to have been done." Just as the validity and legal effect of the bonds survived their destruction so, too, does the situs of the bonds remain, at least until such time as duplicates are issued to the owner and given an abiding place, with some degree of permanence, by the owner. We hold the bonds were not property situated in the United States at the time of the death of the decedent.

Respondent makes an alternative argument that the petitioner failed to show that the bonds were not in the United States at the time decedent made the revocable gift of the bonds to petitioner. The exact date of the gift is not found. Respondent in his notice of deficiency stated the date of the gift was "on or about July 22, 1933," and he does not argue here that the evidence shows any gift after that date. This date is the date of the letter of decedent to Markt & Hammacher Co. of New York to register the bonds in the name of his son in which he stated, "I reserve for me all rights to dispose of them as I like, cash Bond interest etc." Other writings described in our findings of fact indicate the gift might have been before July 22, 1933. There is nothing to indicate any gift after July 22, 1933. There is not any evidence to show the bonds were ever in the United States at any time prior to or on July 22, 1933, and it is conceded both decedent and petitioner were outside the United States at all times before or on July 22, 1933, when a transfer might have been made by manual delivery.

All of the evidence there is shows the bonds were not in the United States on July 22, 1933. Markt & Hammacher Co.'s letter of January 26, 1934, states the bonds were received by them, pursuant to the ex-

change proposal, with decedent's letter of November 11. The only fair inference from all of this testimony is that the bonds were not in the United States on July 22, 1933—the latest date when even respondent would argue a gift was consummated—and that they did not arrive in New York until regular course of a letter mailed in Germany November 11, 1933. We hold the bonds were not in the United States at the time of the revocable gift of the bonds to petitioner.

Sometimes in argument under this issue respondent speaks of the "purported gift" as if all the evidence with respect to a gift being made is somewhat in doubt. It is to be observed that if no gift was in fact made, then respondent has no argument under this alternative issue and we are only concerned with situs at the time of death of decedent—an issue disposed of against the respondent earlier in this opinion.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

MURDOCK and RAUM, *JJ.*, dissenting: It may be that Congress never intended to impose the estate tax in a situation such as this. However, we do not agree with this opinion as it is written.

Bonds are recognized as giving a "situs" to a debt for estate tax purposes if physically present at some point outside the United States. Here, however, no bonds were in existence to evidence the debt at the date of death, and obviously the debt has no "situs" outside the United States. The United States can tax a debt as a part of the estate of a nonresident alien decedent where the debtor is a domestic corporation and there is no bond situated outside the United States to evidence the debt.

Tempting as it may be to construe the statute as excluding the property herein from the reach of the estate tax law, such result cannot fairly be reached by treating the bonds as though they were in existence notwithstanding that they had actually been destroyed and as though their "situs" persisted in Great Britain. If the nonresident alien had bonds of a British corporation which had been physically present in the United States but which had been destroyed and not replaced prior to his death, it would seem strange to urge that such bonds had a continuing "situs" in the United States so as to subject them to estate taxes here. This example illustrates the conceptual difficulties created by the theory of the prevailing opinion.

Moreover, Regulations 105, section 81.50, provide that intangible personal property constitutes property within the United States if consisting of a property right issuing from or enforcible against a domestic corporation in cases where the written evidence of the property is not

treated as being the property itself. Here such a situation exists since there is no written evidence which can be treated as being the property itself, and the intangible personal property consists of a right issuing from and enforcible against a domestic corporation.[1] We do not see how the present result can be reached without getting around this regulation.

TURNER, *J.*, agrees with this dissent.

---

KERN, *J.*, dissenting: As the majority opinion points out, the situs of bonds does not shift by reason of temporary physical absence when it is apparent that the owner intends to return them to their original situs. I would accept the reasoning of the majority that by analogy bonds would not lose their original situs because of their destruction when it is apparent that the owner intends to exercise his equitable right to a reissuance of the bonds and intends to place the reissued bonds where the original bonds were. Thus, if the owner of bonds of an American corporation lived in England, if the bonds had a situs in England, if the bonds were destroyed, and if it was apparent that the owner intended to effect their replacement and their return to England, but died before such replacement and return were effected, then I would agree that the bonds did not lose their original situs, they were not "property situated in the United States," and it is not the congressional intent that they should be includible in such a decedent's estate.

However, the facts of the instant case, in my opinion, make impossible such a result supported by such a line of reasoning. Here, the original owner of the bonds of the American corporation was a national and resident of Germany who caused the bonds to be placed for safekeeping in England. It appears that he had given these bonds in 1930 to his son who has lived in Argentina since 1932. The bonds were destroyed in 1941. The original owner (the decedent) lived in Germany from a time prior to the destruction of the bonds until his death, and "probably never learned of the destruction of the bonds * * *." He died in 1944, a few days after leaving a German concentration camp. In 1943 (prior to decedent's death) the American Alien Property Custodian took over the property of decedent and "made demand on [the American] Company for the bonds destroyed in the air raid," and pursuant to this demand the bonds were reissued to the Alien Property Custodian.

Under these circumstances, it seems obvious to me that the decedent could have had no intention between the time of the destruction of the

---

[1] Moreover, that right is not a mere right to have new bonds issued automatically to replace the old ones. Presumably, such bonds were negotiable, and since a holder in due course would obtain indefeasible rights against the maker, a debtor corporation obviously would not replace allegedly destroyed bonds without adequate safeguards against being held accountable twice for the same debt.

240

bonds and the time of his death to cause the reissuance of these bonds and their return to England, and, even if he had such an intention, he did not have the right to effect it. After 1943 the only person having the right to cause the reissuance of the bonds by the American debtor corporation was the Alien Property Custodian. It is impossible for me, on the facts of this case, to consider the physical destruction of the bonds as analogous, for purposes connected with the determination of their situs, to temporary absence from the place of original situs within the rationale of *N. Y. Central Railroad* v. *Miller* and *Delaney* v. *Murchie*, cited in the majority opinion.

Therefore, I would conclude, contrary to the conclusion of the majority, that the bonds lost their original situs in England before decedent's death, and that the bonds (considered as having been reissued to the Alien Property Custodian pursuant to a right to such issuance vested in him before decedent's death) or the debts at one time evidenced by the bonds constituted "property situated in the United States" at the time of decedent's death and, as such, were includible in decedent's estate.