**UNITED STATES of America, Appellee,**

v.

**Samuel FIORE, Defendant, Appellant.**

**No. 7646.**

United States Court of Appeals, First Circuit.

Dec. 4, 1970.

---

Kevin M. Keating, with whom Joseph S. Oteri, Crane, Inker & Oteri, and Martin K. Leppo, Boston, Mass., were on the brief, for appellant.

Gerald McDowell, Sp. Atty., Department of Justice, with whom Will Wilson, Asst. Atty. Gen., Criminal Division, and Walter T. Barnes, Sp. Atty., Department of Justice, were on the brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Defendant was convicted on two counts of an indictment charging him with violations of the federal anti-loan sharking law. Each count charged that on a specific occasion in November 1969 in North Reading, Massachusetts, the defendant expressly and implicitly threatened the use of violence to cause harm to the person of one Hubert J. Sweeney, the debtor, to collect and attempt to collect extensions of credit from said Sweeney in violation of 18 U.S.C. § 894 (Supp. V, 1970).[1]

---

1. Section 894, which is part of the Consumer Credit Protection Act of 1968, 82 Stat. 146 (1968), provides in pertinent part:

"(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the non-repayment thereof, shall be fined not

more than $10,000 or imprisoned not more than 20 years, or both."

18 U.S.C. § 891(7) provides

"An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

The relevant facts are as follows. In 1963 or early 1964 Sweeney, an insurance broker, after attempting unsuccessfully to borrow money elsewhere, obtained a loan of $3,000 from the defendant. No writings of any kind were signed but the defendant told him that the interest would be 2% a week (104% a year). This required payments of $60 a week in interest alone which Sweeney made every month or so for some two and a half years. In 1967 the defendant told Sweeney that he still owed $1,000 on this loan. In the latter part of that year Sweeney borrowed $2,000 more from the defendant. As in the first instance no papers were signed but this time the interest was raised to 3% a week or 156% a year. Sweeney kept up the interest payments on these loans until the latter part of September 1969 and stopped. Shortly thereafter the defendant began hounding him for payment. Sweeney testified that on November 22 the defendant telephoned him at home, cursed him for not paying, said "the big boss" was there and wanted all the money or else. He also testified that on November 29 defendant telephoned him again and, among other things, threatened that if he didn't pay he was liable "to get a bomb" in his car. Sweeney's wife, who listened in on both conversations, corroborated her husband's testimony with reference to these threats. Sweeney testified that because of the threats he was "very, very much afraid."

In addition to the foregoing, the following significant testimony was adduced at trial. In October 1969 Sweeney misappropriated an insurance client's check for $500, cashed it at defendant's restaurant and gave the defendant $300 out of the proceeds towards payment of interest on the loans. Sweeney's boss testified that he fired him when he learned of this misappropriation. He also testified to two conversations he had with the defendant which have an important bearing on the issues involved in this case.[2]

The defendant admitted loaning money to Sweeney knowing that he had no credit but disputed the amounts of the loans and denied making the threats. He also denied that he was in the loan business or that he was a loan shark.

█ On appeal, defendant's major contention is that Congress had no power or authority to enact the statute in question. In passing this legislation, however, Congress relied on its constitutional power to "regulate commerce * * * among the several states" and "to establish * * * uniform laws on the subject of bankruptcies. * * *"[3] The act contains pertinent congressional findings regarding the relationship between organized crime and extortionate credit transactions and their effect on interstate commerce and the federal bankruptcy laws. It also contains a forceful declaration of congressional purpose to remedy the evils mentioned in these findings through the exercise of its aforesaid powers.[4] These findings were based on evidence before Congress. Clearly they have a rational basis and therefore are not open to question here. United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965).

The defendant contends that the statute may not be sustained under either of said clauses of the Constitution. Although we recently stated in United States v. Tomasetta, 429 F.2d 978 (1st Cir. 1970), that the constitutionality of this statute was "a subject of serious controversy," we are impressed by the fact that every court that has considered this statute has sustained it under the

2. He stated that the defendant told him, "They are after him [Sweeney] to pay and I told him I was not going to pay until Sweeney's broken up or in a box." The witness also testified that he chided the defendant for lending Sweeney so much money when the latter was in financial trouble. He then said to the defendant, "This sounds like the Mafia," to which the latter replied, "Something like that."

3. U.S.Const. Art. I, § 8, cls. 3, 4.

4. Consumer Credit Protection Act, Title II, § 201, 18 U.S.C. § 891 (Supp. V, 1970).

Commerce Clause. See United States v. Perez, 426 F.2d 1073 (2d Cir. 1970), cert. granted, 400 U.S. 915, 91 S.Ct. 175, 27 L.Ed.2d 154 (U.S. Nov. 16, 1970); United States v. Biancofiori, 422 F.2d 584 (7th Cir.), cert. denied, 398 U.S. 942, 90 S.Ct. 1857, 26 L.Ed.2d 277 (1970); United States v. Curcio, 310 F.Supp. 351 (D.Conn.1970), and United States v. Calegro De Lutro, 309 F.Supp. 462 (S.D. N.Y.1970). We are further impressed by the fact that, although the court in *Perez* did not reach the question, the court in each of the other three cases also sustained § 894 under the Bankruptcy Clause. Most of the contentions made in the instant case were considered and rejected in these four cases and we need consider them only briefly here.

In Heart of Atlanta Motel v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964), the Court stated "[T]he power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof * * * which might have a substantial and harmful effect upon that commerce." In attacking the power of Congress to enact § 894 under the Commerce Clause, defendant contends that in prosecutions under this statute the Constitution requires a determination, on a case to case basis, that interstate commerce is involved and that this determination must be made in a judicial proceeding. Suffice it to say that in upholding the validity of the

Drug Abuse Control Amendments of 1965 this court, as well as other circuit courts, have held that such a showing is not constitutionally required. White v. United States, 395 F.2d 5 (1st Cir.), cert. denied, 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968); *accord*, United States v. Cerrito, 413 F.2d 1270 (7th Cir. 1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970); White v. United States, 399 F.2d 813 (8th Cir. 1968); Deyo v. United States, 396 F.2d 595 (9th Cir. 1968).[5]

Also, defendant relies heavily on United States v. Five Gambing Devices, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953), especially on the dictum of Mr. Justice Jackson that "No precedent of this Court sustains the power of Congress to enact legislation penalizing failure to report information not shown to be in, or mingled with, or found to affect commerce." *Id.* at 446, 74 S.Ct. at 193. But as we noted in White v. United States, *supra*,

> "there seems little doubt that *Heart of Atlanta* goes beyond the dictum in *Gambling Devices* in its willingness in a proper case to approve legislation declaring that certain activities affect interstate commerce per se without requiring proof in each case." 395 F. 2d 5, 8 n. 3.

*Accord, Perez, supra*, 426 F.2d at 1078.[6] Thus we conclude that § 894 is sustainable as a valid exercise of congressional power under the Commerce Clause.

5. Dictum in Minor v. United States, 396 U.S. 87, 98 n. 13, 90 S.Ct. 284, 24 L.Ed. 2d 283 (1969), lends additional support. *Accord, Perez, supra*, 426 F.2d at 1077 n. 2. In considering 26 U.S.C. § 4705(a) (1964), a revenue statute, the court said, "Even viewing § 4705(a) as little more than a flat ban on certain sales, it is sustainable under the powers granted Congress in Art. I, § 8. *See* Yee Hem v. United States, 268 U.S. 178, 183, 45 S.Ct. 470, 69 L.Ed. 904 (1925); Brolan v. United States, 236 U.S. 216, 222, 35 S.Ct. 285, 59 L.Ed. 544 (1915); *cf.* United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941)." The dissent disagrees

with the use of the Commerce Clause to sustain a taxing measure, *Minor* at 101, 90 S.Ct. at 290. *Cf.* Burnet v. Brooks, 288 U.S. 378, 389, 53 S.Ct. 457, 77 L.Ed. 844 (1933). But it did not attack the conclusion that the Commerce Clause could have been used had the statute been passed under it.

6. In *Perez*, the Second Circuit agreed with our opinion in *White*. It rejected the *Gambling Devices* argument on the grounds that both the opinion by Mr. Justice Jackson and the dissent by Mr. Justice Clark can only be read to say that the question is a substantial one. *See also Calegro De Lutro, supra*, 309 F. Supp. at 464.

This statute may also be sustained as a "necessary and proper" extension of the congressional power to make uniform laws concerning bankruptcies. United States v. Biancofiori, *supra*. In enacting the statute Congress expressly found that "Extortionate credit transactions directly impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies." [7] Congress also stated,

"Article I, Section 8, of the Constitution expressly empowers Congress to make 'uniform laws on the subject of bankruptcies.' In the exercise of this power, Congress has enacted the Bankruptcy Act, which confers on any debtor the statutory right, with certain qualifications, to be discharged of his debts by applying substantially all of his property toward their repayment. It is obvious, however, that obligations as to which there is an understanding that they may be collected by extortionate means, or which are actually so collected, are not susceptible of being 'discharged' in bankruptcy in any meaningful sense. Such transactions thus deprive the debtor of a Federal statutory right, and at the same time defeat one of the principal purposes of the Bankruptcy Act, which is to afford insolvent persons the opportunity to make a fresh start. Thus, it seems clearly within the power of the Congress to protect the Federal statutory right, and to assure that the bankruptcy laws will be carried into execution, by enacting legislation to prohibit extortionate credit transactions." [8]

These findings also have a rational basis and are not open to question here.

The instant case is a typical example of the direct connection between loan-sharking and bankruptcy. As here, loan-sharks lend money to persons who are usually in financial trouble but are unable to borrow from other sources. These victims are the ones most likely to use the bankruptcy laws. The loanshark uses extortionate means to make sure that the interest on the loans is collected first. In a situation of this kind the debtor cannot freely exercise his rights under the Bankruptcy Act without running the risk, as in the instant case, of sustaining bodily harm. As was so aptly pointed out in the government's brief, loansharking works a substantial inhibiting effect on the exercise of federal rights under the bankruptcy laws.

In our view Congress could reasonably assume that the very finding of threats of violence means that the debtor is near enough to insolvency to need his bankruptcy rights protected. But proof of the debtor's financial condition must be generally predicated on his willingness to testify to it. In threat cases, testimony is likely to be unavailable. The congressional purpose throughout the statute is to lessen the necessity of the prosecution's relying on the victim's testimony.[9] In a rare instance a solvent debtor might refuse to pay out of sheer obstinacy or in reliance on a state usury law. Yet the likelihood of the debtor being solvent is remote, whereas proof of his solvency may be extremely difficult. We cannot say, therefore, that Congress' assumption was not reasonably adapted to the task of protecting bankruptcy rights and thus we also sustain the statute under the Bankruptcy Clause.

▆▆▆ Defendant attacks the constitutionality of subsections (b) and (c)

7. Consumer Credit Protection Act, Title II, § 201(a) (4), 18 U.S.C. § 891 (Supp. V, 1970).

8. 1968 U.S.Code Cong. & Admin.News, pp. 2025–26.

9. Congress felt that, if debtors are "in genuine fear of the consequences of nonpayment, they are apt to be equally or even more in fear of the consequences of testifying as a complaining witness." 1968 U.S.Code Cong. & Admin.News, p. 2026. For these reasons, Congress provided special evidentiary rules under § 894 (b) and (c).

of § 894,[10] claiming that these subsections violate his freedom to contract and his right to confront witnesses against him. Defendant has no standing to attack his conviction on said grounds because the record shows that these subsections were not applied to him. United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co., 226 U.S. 217, 219–220, 33 S.Ct. 40, 57 L.Ed. 193 (1912); Reddy v. United States, 403 F.2d 26 (1st Cir. 1968), cert. denied, 393 U.S. 1085, 89 S.Ct. 871, 21 L.Ed.2d 778 (1969). His further contentions that the indictment is too vague when measured by *Tomasetta* standards [11] is utterly lacking in merit and is summarily rejected.

■ Defendant also urges that the term "implicitly threaten" as used in the statute violates his right to free speech and is too vague. He concedes that to forbid express threats in situations such as the instant case is not unconstitutional. As he was indicted and convicted for "expressly *and* implicitly" threatening Sweeney, the jury must have found that there was an express threat as well as an implicit one. Since under the statute the jury could convict by finding an express threat, which it did, defendant has no standing to question the constitutionality of the implicit threat aspect of the statute. *Raines, supra; Ashwander, supra; Yazoo & Mississippi Valley R. Co., supra; Reddy, supra.* All other points raised have also been considered and found to be without merit.

Affirmed.

---

10. Section 894(b) provides that evidence of the debtor's knowledge that "one or more extensions of credit by the creditor were collected or attempted to be collected by extortionate means may be introduced" to prove an implicit threat. Section 894

(c) provides for admission into evidence of the defendant's reputation in the community.

11. See United States v. Tomasetta, supra.