[S. F. No. 17846. In Bank. Jan. 21, 1949.]

JAMES HURST et al., Petitioners, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Long & Levit, Percy V. Long and Bert W. Levit for Petitioners.

John J. O'Toole, City Attorney, Walter A. Dold, Chief Deputy City Attorney, A. Dal Thomson, Deputy City Attorney, and Dion R. Holm, Public Utilities Counsel, for Respondents.

CARTER, J.—The controversy presented in this proceeding concerns the construction of section 130 of the charter of the city and county of San Francisco (*infra*). Petitioners herein, residents, taxpayers and electors of said city and county, seek by mandamus to compel the Public Utilities

Commission of said city and county to put into effect a straight 10-cent passenger fare schedule for the city's street railway and transportation system which was adopted by it in October, 1948.

There is no dispute on the facts. The commission has charge of the operation of the utility. Since 1946, the fare schedule, as established by the commission, has been three rides for 25 cents or an eight and one-third cents fare when three fares were purchased at the same time. In April, 1948, the proposed budget for the operation of the utility, approved by the board of supervisors of said city and county, called for an expenditure for the current fiscal year (July 1, 1948, to June 30, 1949, inclusive) of $20,298,456. That sum was to come from anticipated receipts from streetcar fares for that fiscal year of $17,500,000, and the balance was made up of a surplus accumulated from previous years amounting to $293,-723, and use and ad valorem taxes levied and to be collected for that year amounting to $2,504,733. After complying with the requirements of the charter, and in October, 1948, the commission duly made its order increasing the fare to a straight 10-cent fare to be effective December 1, 1948, and it was estimated that that increase would enlarge the income from fares for the balance of the current fiscal year to $19,-046,233, an augmentation of $1,546,233. With the increased fare the estimated revenue from fares for the next succeeding fiscal year (July 1, 1949, to June 30, 1950, inclusive) will be $20,407,323. Adding to that the $1,546,233 arising from the increased fare for the period from December 1, 1948, to the end of this fiscal year, makes a total sum of $21,953,556, which is $852,416 in excess of the estimated operating expenses for the next fiscal year. The commission's order establishing the new fare schedule was submitted to the board of supervisors which refused approval of it by a majority vote, but less than a two-thirds majority. No action was taken by the board to reject the new fare schedule as provided by the last two sentences of section 130 of the charter (*infra*).

The controversy concerns the effect of the action of the board of supervisors in the light of the charter provisions, chief of which is section 130 reading: "Rates [fixed by the commission] for each utility shall be so fixed that the revenue therefrom shall be sufficient to pay, for at least the succeeding fiscal year, all expenses of every kind and nature incident to the operation and maintenance of said utility, together with the interest and sinking fund for any bonds issued for the

acquisition, construction or extension of said utility; *provided, that, should the commission propose a schedule of rates, charges or fares for said utility which shall not produce such revenue, it may do so with the approval of the board of supervisors, by a two-thirds vote and it shall thereupon be incumbent to provide by tax levy for the additional amount necessary to meet such deficit.* All other changes in rates, charges or fares as proposed by the commission shall be submitted by the commission to the board of supervisors for approval, and, except as in this section otherwise provided, it shall require a two-thirds vote of the board of supervisors to reject the rate changes as proposed by the commission, and if so rejected, such proposed changes in schedules of rates, charges or fares shall be returned to the commission for revision. If the supervisors shall fail to act on any such proposed schedule within thirty days, the schedule shall thereupon become effective." [Emphasis added.]

Respondents' position is that under section 130 the fares fixed by the commission shall be sufficient to pay at least all the operating expenses for the succeeding fiscal year; that the new fare schedule adopted by the commission although an increase over the old, is insufficient to pay the operating costs for the next fiscal year (July 1, 1949, to June 30, 1950) unless consideration be given to the surplus ($1,546,233) which would accumulate during the period from December 1, 1948, to the end of the current fiscal year by reason of the new fare schedule; that such surplus cannot be taken into account because its existence would not be possible except for the taxes which were levied to meet the operating expenses for the current fiscal year; that the reference in section 130 to the succeeding fiscal year means the portion of the fiscal year remaining after the schedule is fixed rather than the next whole fiscal year; that the new schedule will not produce sufficient revenue without taking into account the taxes levied for the current fiscal year; and that thus the italicized portion of section 130 is applicable and there has been no compliance therewith inasmuch as the board of supervisors refused approval of the new schedule rather than approving it by a two-thirds majority vote.

Petitioners assert: (1) That by reason of other provisions of the charter construed with section 130 no moneys may be expended for the operation of the utility except when appropriated by the board of supervisors; that the appropriation for the current fiscal year has been made (the sources of

the money, including taxes to satisfy the appropriation have been mentioned) ; that as no more than that and that alone may be used for the current fiscal year, the surplus that will result at the end of the current year necessarily consists solely of anticipated revenue from fares to be collected under the new schedule and not taxes levied for the current year; that thus the new rate schedule is sufficient to create a self-sustaining basis of operation for the next fiscal year and the italicized portion of section 130 is not applicable. (2) That the italicized portion of section 130 is operative only when it is necessary for the board of supervisors to levy a tax to make up a deficit resulting from a rate schedule insufficient to earn an amount equal to the operating expenses.

Without passing upon petitioners' first premise, the second seems to be the only reasonable interpretation of section 130. It is true that section 130 calls for a rate sufficient to meet the operating expenses for the succeeding fiscal year but the part to be played by the board of supervisors relates to a situation where taxes must be levied to make up a deficit. It is clear from section 130 that the primary duty and right to fix rates rests with the commission rather than the board. It is only in the specific instance mentioned in the italicized portion of section 130, and when the board acts by a two-thirds majority to reject the commission's proposed rate, that the board is concerned with the fares. Unless the primary power of the commission is to be unequivocally curtailed, the language of the section (130) must be construed to uphold it. The italicized portion of section 130 is in the form of a proviso, that is, an exception, and for that reason should not be construed to limit the general power except to the extent that it clearly does so. (See, *McAlpine* v. *Baumgartner,* 10 Cal.2d 409 [74 P.2d 753].) Examining particularly the language of the proviso, it should be noted that a rate schedule which is insufficient to defray operation costs may be proper if the board approves it by the required vote, but it does not stop there. It goes on to say, "*and* it shall be incumbent" to provide a tax levy to meet the *deficit.* In other words the approval of the board by a two-thirds vote of a fare schedule fixed by the commission is necessary only when the result would be a deficit which must be met by a tax levy. The tax levy is obligatory—mandatory, thus there would be no occasion for an approval by a two-thirds vote of the board unless there would also be a deficit and a tax levy would be indispensable. The taxpayer is thus assured of adequate protection against

being required to pay taxes to support the utility by the requirement of a two-thirds vote of the board of supervisors. The same principle is declared in section 74 of the charter reading: "In the event the public utilities commission and the mayor shall propose *a budget* for any utility which will exceed the estimated revenue of such utility, it shall require a vote of *two-thirds of all members of the board of supervisors to approve such budget estimate* and to appropriate the funds necessary to provide for the *deficiency.*" [Emphasis added.]

■ There can be no doubt that the reference to the "succeeding fiscal year" in section 130 for which a fare shall be fixed at least equal to the operating expenses, means the next complete fiscal year after the date the schedule is fixed rather than the rest of the fiscal year in which the rate is established. "Succeeding" means "follow[ing] another thing in order" (Webster's New International Dictionary, p. 2517). If only the balance of the fiscal year were intended there would be no occasion for the use of the word "succeeding" inasmuch as it is not to be supposed the purpose of having fares to raise sufficient revenues was for conditions that occurred in the past. The reference is to the future, giving opportunity for budget making and any necessary tax levies. The succeeding fiscal year mentioned is a whole fiscal year not a part of one. The fear that the board of supervisors will not be in a position to protect the taxpayers in such cases as where the commission might fix a schedule to go into effect the day after the commencement of a fiscal year is not well founded. The board may always reject the proposed schedule under the last portion of section 130.

It follows, therefore, that the italicized portion of section 130 (*supra*) is not applicable to the new schedule adopted by the commission. The last part of the section is pertinent. There being no rejection of the schedule by a two-thirds majority of the board within the time therein required, or at all, it is the plain duty of respondents to put into effect such schedule.

It is ordered that a peremptory writ of mandate issue as prayed for.

Gibson, C. J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

SHENK, J.—The opinion and decision in this case enforces a transportation fare which has not been fixed as required

by the organic law of the city or at all except by the order of this court. This may be demonstrated by a reference to the charter provisions and to the undisputed facts.

Section 69 of the charter designates the fiscal year as commencing on July 1st. That section also provides that prior to February 15th preceding the commencement of the fiscal year, budget estimates for the next fiscal year must be filed and on that date, after adjustment and revision, the estimates are transmitted by the chief administrative officer to the controller. Not later than March 15th the controller is required to transmit a consolidated budget to the mayor, whereupon public hearings are held. On or before May 1st (§ 72) the mayor sends to the board of supervisors the consolidated budget, the proposed budget and detailed estimates of revenues of each department, together with a draft of an appropriation ordinance based on the proposed budget which is then published. After public hearings and between May 15th and June 1st, the board adopts the proposed budget as submitted or as amended, and passes the necessary appropriation ordinance which becomes the authority for the use of the moneys appropriated to the specified purposes within the limits of the appropriation. Section 74 provides that in the event the public utilities commission and the mayor should propose a budget for a utility which will exceed the estimated revenue of the utility, a vote of two-thirds of all members of the board is required to approve the budget estimate and an appropriation is made from tax moneys to meet the deficiency.

Section 78 requires that on or before September 15th of each year the board levy a tax which will be sufficient to cover all appropriations made by the appropriation ordinance. Section 81 provides for a general cash reserve to take care of expenditures in the interim between the commencement of the fiscal year and the levy and collection of taxes. However, by sections 77 and 80, authorized transfers of unused appropriations at the end of a fiscal year are not permitted from utility funds which are to be indicated as surplus to be taken into account as revenue of the ensuing fiscal year. A proviso in section 80 subjects such unused utility funds to supplemental appropriation procedure and ordinance on recommendation of the commission, and approval and submission by the mayor in the same manner as the annual appropriation except as to time.

Sections 119-133 provide for municipal acquisition of public utilities and the operation thereof by a public utilities com-

mission thereby created. Section 130 places the utility rate-fixing power in the commission. Before adopting or revising rates the commission is required to publish notice of its intention and fix a time for a public hearing. The section then provides: "Rates for each utility shall be so fixed that the revenue therefrom shall be sufficient to pay, for at least the succeeding fiscal year, all expenses of every kind and nature incident to the operation and maintenance of said utility, together with the interest and sinking fund for any bonds issued for the acquisition, construction or extension of said utility; provided that, should the commission propose a schedule of rates, charges or fares for said utility which shall not produce such revenue, it may do so with the approval of the board of supervisors, by a two-thirds vote and it shall thereupon be incumbent to provide by tax levy for the additional amount necessary to meet such deficit. All other changes in rates, charges or fares as proposed by the commission shall be submitted by the commission to the board of supervisors for approval, and, except as in this section otherwise provided, it shall require a two-thirds vote of the board of supervisors to reject the rate changes as proposed by the commission, and if so rejected, such proposed changes in schedules of rates, charges or fares shall be returned to the commission for revision. If the supervisors shall fail to act on any such proposed schedule within thirty days, the schedule shall thereupon become effective."

The charter provisions clearly provide that the commission has the primary function and duty of fixing rates for the operation of the railway system of San Francisco which will produce sufficient revenue to cover operating costs; that the board of supervisors acts secondarily in the matter and may not reject a sufficient rate except by a two-thirds vote; that an insufficient rate, that is, one which will not produce revenue equal to expenses, may be approved only by a two-thirds vote of the board, in which event resort must then be had to taxation to meet the deficit.

Prior to the fiscal year 1948-49 the commission and the mayor proposed in the annual budget a total estimated expenditure of $20,298,456 for the railway system, which was $2,504,733 in excess of expected 1948-49 revenues. By the necessary vote of the board of supervisors the expenditure was approved and the deficit appropriated from use and ad valorem taxes. In September, 1948, the manager of utilities recommended to the commission that the fare schedule be

revised upward. Upon publication of notice of intention to revise the existing rates, a public hearing was conducted by the commission in October. At the conclusion of the hearing the commission submitted the revised schedule to the board specifying a basic straight 10-cent fare (an increase over the prevailing three tokens for 25 cents), together with tables of estimated results of revenue adjustment for the current and ensuing fiscal years, and designated December 1, 1948, as the effective date of the increase.

Before acting on the matter the board submitted to the city attorney the question whether it was necessary for the board to approve the revised schedule by a two-thirds vote, assuming the correctness of the tables of estimated results of revenue adjustment. On October 22, the city attorney rendered his opinion that the estimated "surplus" of $1,546,233 assumed in the tables to survive the close of the 1948-49 fiscal year (in the event the new schedule went into effect on December 1, 1948), depended for its existence on the resort to the tax moneys above mentioned; that without resort to such tax moneys the increase to a straight 10-cent fare would not yield sufficient revenue to pay all expenses of operation; that since a deficit rather than a surplus would be created the applicable provisions of section 130 of the charter required a two-thirds vote of the board to approve the schedule submitted by the commission.

The board of supervisors consists of 11 members. On November 1, 1948, the board acted upon the matter, four members voting for and six against approval. On November 8th, the commission adopted a resolution by which it was stated that the new schedule would not be put into effect. The commission apparently then considered the advisability of fixing a 12-cent fare, for its resolution contained the following ". . . No increase in fares sufficient to meet all costs is presently contemplated inasmuch as the Commission does not now believe that a fare increase to twelve cents is in the best interest of the Railway or the people."

Thereupon the petitioners commenced the present proceeding. They assert that the revised rate schedule should be deemed to produce sufficient revenue because the tables of adjusted revenues show $1,546,233 carried over as "surplus" for use in the fiscal year 1949-50; in which case the vote of the board was insufficient to reject the schedule and pursuant to section 130 of the charter the new schedule should

be in effect. The respondents counter that the so-called "surplus" originated from tax money which may not constitute a surplus or be considered revenue from operation for any purpose whatsoever during any part of the effective period of the rate schedule; therefore the proposed rate is insufficient to produce operating costs and the failure of the board to adopt it by the required two-thirds majority necessitates a conclusion that there is no action of the commission or the board to establish an effective rate and justify the issuance of the writ.

The petitioners argue that their position is correct because section 130 of the charter provides that the rate shall be so fixed that the revenue therefrom shall be sufficient to pay operating costs "for at least the succeeding fiscal year"; that "the succeeding fiscal year" in this instance refers to the fiscal year 1949-50 which follows the current fiscal year; that since the "surplus" estimated to be carried over into 1949-50 may be taken into account as revenue and appropriated by the board pursuant to section 80, there will be sufficient "revenue" from operation under the new rate to meet expenses; that there was therefore no effective action of the board by which the revised rate schedule may be deemed rejected, and the rate increase is in force. The respondents stand upon the argument that "the succeeding fiscal year" refers to the current fiscal year, but that in any event the surplus referred to in section 80 does not encompass unused tax moneys; that the "surplus" carried over in the tables constitutes such tax moneys, and therefore may not be included in revenue for the fiscal year 1949-50.

There is no necessity to designate the specific fiscal year named as "the succeeding fiscal year." Consideration of the entire phraseology indicates that the period commencing with the proposed effective date of the revised rate must be contemplated by the commission and the board. The rate was not fixed for but one fiscal year, nor is it revised in each succeeding fiscal year. Revision is permitted whenever it becomes necessary in order to cover operating expenses, and the rate then fixed is not again revised until, in the opinion of the commission, necessity therefor is indicated by changing conditions. However, taking 1949-50 as the test year, there is still no firm foundation for the petitioners' case. The courts should be bound to consider as controlling the over-all intent that revenues from operation should produce sufficient to meet expenses. Concededly the new rate will not do that, even in

the test year, without the aid of moneys derived from taxation. The commission, the city attorney, and the board—all were aware of that fact when the board acted. The board was advised of the vote required to make the rate effective. The board preferred to withhold approval of a rate which would not produce the required revenue. The matter then rested with the commission for further action, but that body was of the opinion that present economic conditions would not warrant a further increase sufficient to meet all costs. The wisdom of those conclusions is not for the courts. The operation of the utility and its supervision are the functions of the commission and the board, with powers of necessary tax levy in the latter. When these bodies as here determine that tax moneys remain tax moneys and may not be converted into ''revenue'' there is no sufficient warrant or sanction in law for the courts to hold otherwise. Certainly it may not be said as a matter of law that the administrative decision is erroneous which excludes tax moneys from a revenue surplus. In themselves the terms are contradictory and therefore may properly be deemed to be mutually exclusive.

Thus there is apparent agreement that operation alone under the straight 10-cent fare basis will not yield sufficient revenue to pay all expenses of operation. This is implicit in the tables of estimated results of revenue adjustment for the fiscal year 1948-49 and 1949-50; it is asserted by the city attorney and by the public utilities commission; and it is admitted by the majority opinion which shows that $2,504,733 derived from tax moneys must be resorted to in order to make up the deficits. Nevertheless tax moneys unused at the close of the fiscal year 1948-49 are metamorphosed into a surplus from operating revenues for use in the fiscal year 1949-50 without regard to any necessity for appropriation thereof. Thereby the majority has concluded that the last portion of section 130 of the city charter which deals with the matter when there will be no deficit and a two-thirds vote of the board of supervisors is required for rejection of the proposed increase is applicable, and disregards the provision which prescribes that when the proposed rate will not produce sufficient to cover operating expenses a two-thirds vote is necessary for approval. In my opinion the decision contravenes the admitted facts and the applicable charter provisions.

In reality the petitioner's position is that the failure or refusal to put into effect the revised straight 10-cent fare

would necessitate a resort to *more* tax money to make up the deficiency. However any approach to the problem confronting the municipal authorities involves estimates of future revenues from transportation fares. The power and responsibility rests with the Public Utilities Commission to make those estimates and to establish a fare based thereupon sufficient to meet all expenses of operation exclusive of aid from taxation. If it does so the fare goes into effect subject to the power of the board of supervisors to reject it by a two-thirds vote. The commission states and is on record by formal action declaring that it has not fixed such a fare and its position is supported by the facts. Since on November 1, 1948, the board failed to approve the proposed fare as required by the charter, and the commission on November 8th rescinded its order fixing the 10-cent fare; there is no revised fare in force. In my opinion the whole matter is in the lap of the city authorities with no new schedule of fares now in effect. That is where it should be left for appropriate future action.

The petition should be denied.