[S.F. No. 23760. June 16, 1978.]

Estate of HERBERT N. BANERJEE, Deceased.
KENNETH CORY, as State Controller, Petitioner and Appellant, v.
BANK OF AMERICA, Objector and Respondent.

■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Myron Siedorf, Edwin Rosenthal and James R. Birnberg for Petitioner and Appellant.

Jordan, Walsh, Lawrence, Dawson & Carbone, Donald J. Lawrence and Michael P. Carbone for Objector and Respondent.

Almon B. McCallum and Marc Isaacson as Amici Curiae on behalf of Objector and Respondent.

**OPINION**

**THE COURT.**—We granted a hearing in this case to resolve a conflict between Court of Appeal opinions in this and an earlier case. After an

independent study of the issue, we have concluded that the careful and scholarly opinion of Judge Lazarus (assigned) for the Court of Appeal, First Appellate District, in this case correctly treats the issues, and we adopt it as our opinion. That opinion, with appropriate deletions and additions,* is as follows:

The State Controller appeals from an order of the superior court sustaining objections filed by respondent Bank of America, N.T. & S.A., as ancillary administrator of the estate of Herbert N. Banerjee, a deceased nonresident alien, to the report of the inheritance tax appraiser. The tax would have amounted to $64,078 if the report had been approved. The effect of the order sustaining the objections was to reduce the estate's maximum tax liability to the sum of $2,741.

Which of these two figures is correct depends entirely on the question as to whether certain stock certificates for shares belonging to decedent in non-California corporations[1] of an aggregate value of $931,279.13 should have been included as taxable items. These stock certificates together with other assets were held for decedent by the Bank of America at San Francisco in an investment management account. The administrator contends that the stock certificates representing shares in companies incorporated under the laws of other states are expressly excluded from taxation by the provisions of Revenue and Taxation Code section 13303, subdivision (b). The Controller insists, on the other hand, that the statute has been misread by both respondent and the court; hence, this appeal in which the only issue is as to the jurisdictional reach of section 13303.

A brief summary of the specific facts upon which this dispute is predicated follows.

Decedent was a resident and national of Japan at the time of his death, September 12, 1972. Starting in 1962, he established and maintained an investment management agency account with the Bank of America in San Francisco. When he died, his portfolio included the following assets, all of which were more specifically listed and described in the inventory and appraisement filed in the probate proceeding:

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

[1]"Non-California corporations" are corporations not organized under the laws of California or which do not have their principal place of business or do the major part of their business in California.

*Cash*: (bank accounts, certificates of deposit, etc.)  $512,626.89

*Stocks* held in said agency account:

(a) "California stocks," that is, stocks of corporations incorporated in California or having their principal places of business in California or doing the major part of their business in California:

| | | |
|---|---|---|
| Bankamerica Corporation | $62,040.50 | |
| Lockheed Aircraft Corp. | 1,962.50 | |
| Safeway Stores, Inc. | 30,150.00 | |
| | | 94,153.00 |

(b) Remaining stocks in agency account, consisting of stocks of corporations incorporated in other states of the United States or having principal places of business other than California or not doing the major part of their business in California ("non-California stocks")

931,279.13

Total  $1,538,059.02

Respondent concedes at the outset that the "California stocks" referred to in paragraph (a) above were subject to inheritance tax, and that the estate was further liable to pay any "pickup" tax equal to the state tax credit allowed decedent's estate in its federal estate tax return. The objections which were filed by the administrator were therefore only directed to the report insofar as it included in its calculations a tax on the "non-California stocks" mentioned in paragraph (b). The hearing thereon was held before the Honorable Paul E. Springer, court commissioner, sitting as judge pro tem., by stipulation of the parties. After considering evidence both oral and written, he rendered the decision from which this appeal has been taken.

I

The outcome of this appeal therefore hinges upon how the language of Revenue and Taxation Code section 13303 is to be interpreted. In its present form, that section reads: " 'Estate' or 'property' means the real or personal property or interest therein of a decedent or

transferor, and includes all of the following: [¶] (a) All intangible personal property of a resident decedent within or without the State or subject to the jurisdiction thereof. [¶] (b) *All intangible personal property in California belonging to a deceased nonresident of the United States, including all stock of a corporation organized under the laws of California or which has its principal place of business or does the major part of its business in California or of a federal corporation or national bank which has its principal place of business or does the major part of its business in California,* excluding, however, saving accounts in saving and loan associations operating under the authority of the Division of Savings and Loan or the Federal Home Loan Bank board and bank deposits, unless such deposits are held and used in connection with a business conducted or operated, in whole or in part, in California." (Italics added.)

The disagreement between the parties focuses on the meaning and effect to be given to the phraseology appearing in italics. Respondent argues that we must follow the Latin maxim, *expressio unius est exclusio alterius*[2] in interpreting the statute. This being so, the contention goes, the section can only be read as imposing a tax on stock issued by the kind of corporations mentioned after the word "including," thereby excluding from state taxation stock certificates issued by other corporations, no matter where the certificates evidencing the ownership thereof may be physically located.

This, according to the Controller, is a misconception. He reasons that the first part of subdivision (b), providing that "[a]ll intangible personal property in California belonging to a deceased nonresident of the United States" is subject to tax, manifestly includes stock certificates, and that its import is in no way limited or otherwise diminished by anything said in the clause that follows.

We find no authority directly in point except what was said in the course of an opinion by a divided court [] [in] *Estate of Hall* (1977) 71 Cal.App.3d 219 [139 Cal.Rptr. 336] []. In order to reach its decision, the majority in that case saw fit to invoke another legal maxim, *mobilia sequuntur personam* (movables follow the person). We agree with respondent that if the rationale of *Hall* is to be followed it would appear to be dispositive here, since it was an adjudication based upon similar

[2]Mention of one thing implies the exclusion of another thing. For an explanation of the practical effect of the maxim in instances in which it may be applicable, see *Estate of Pardue* (1937) 22 Cal.App.2d 178, 180-181 [70 P.2d 678].

facts.[3] However, we are reluctantly obliged to differ with [] [*Hall*]. We firmly but deferentially take particular exception to the view expressed in the majority opinion that "the test to be applied in determining that situs [of certificates representing stock owned by a foreign resident] is the doctrine of *mobilia sequuntur personam.*"[4] (*Id.*, at p. 226.)

This appears to be clearly contrary to what has been said to be the law by higher authority. *Estate of McCreery, supra,* 220 Cal. 26, and *Burnet* v. *Brooks* (1933) 288 U.S. 378 [77 L.Ed. 844, 53 S.Ct. 457, 86 A.L.R. 747], both patently hold that where stock certificates are owned by persons not residing in the United States the reasons that might otherwise give resort to the maxim vanish. Each of these tribunals make it unequivocally clear that in such instances there is no occasion to apply the maxim and that consequently the stocks may have both an actual or constructive situs. Thus, a death tax may be imposed if certificates representing the shares owned by a decedent are physically located within the jurisdiction of the taxing authority. There has been no subsequent change in the law since these cases were decided.

McCreery was a resident and citizen of Great Britain who died testate in 1931. His estate was probated in England, but there were ancillary proceedings here as he owned stock in a corporation organized under the laws of this state. The certificates of stock for these shares were also physically located in California and were listed as assets of his estate in the inventory in the ancillary probate proceedings. The report of the inheritance tax appraiser included a tax on these shares. The report was at first confirmed by the court, but this order was thereafter reversed by the trial court on application of the respondents. The appeal by the Controller was from the latter order. (*Estate of McCreery, supra,* 220 Cal. at pp. 27-28.) One of the issues in that case was as to whether the due process clause of the Fourteenth Amendment to the federal Constitution prevented California from collecting an inheritance tax on stock of a California corporation in the estate of a nonresident of the United States,

[3]The decedent in *Hall* was a resident of France. She died leaving an unexercised power of appointment over a testamentary trust in her predeceased husband's estate. It included stock certificates in non-California corporations kept in a safe deposit box in Los Angeles where the husband lived. The trial court's finding that the stock certificates did not have a California situs and were not otherwise taxable under section 13303, subdivision (b), was affirmed on appeal.

[4]All of the cases cited in the opinion in *Hall* in support of this statement were decided before the rule in California was changed by *Estate of McCreery* (1934) 220 Cal. 26 [29 P.2d 186], as explained below. While *McCreery* is also cited, it is only apposite as authority for applying the maxim in cases in which stock certificates are owned by persons residing in the United States.

the certificates representing the stock also being physically located in California.[5] (*Id.,* at p. 28.)

The court noted that "as to intangibles the courts still apply the legal fiction of *mobilia sequuntur personam* and have thus confined the place of taxation to the state of the domicile of the owner. But *this restriction has as yet been applied only to estates of decedents who were residents within the United States.*[6] (*Farmers Loan Co.* v. *Minnesota,* 280 U.S. 204 [50 Sup.Ct. 98, 74 L.Ed. 371, 65 A.L.R. 1000]; *First Nat. Bank* v. *Maine,* 284 U.S. 312 [52 Sup.Ct. 174, 76 L.Ed. 313, 77 A.L.R. 1401].) The rule which selects the domicile, as distinguished from the situs of the intangibles, was and is largely one of logic and convenience. But *the reasons assigned for this selection all fail where the decedent was domiciled without the United States.* It by no means seems certain that a valid rule could not have been promulgated which fixed the constructive situs of the intangibles as the place of taxation instead of the domicile of the owner. Moreover, the above cited holding does not specifically purport to fix the rule controlling the jurisdiction for taxation where the owner of the intangibles was domiciled without the United States, whether he was a citizen of the United States or a citizen of a foreign nation. Intangible property in one of the states of a nonresident of the United States receives the protection of our laws. Why may not the privilege of receiving it by transfer or succession be taxed by some state at least of the United States? And if it may be so taxed, *why may not such tax be assessed in the state of the actual or constructive situs of such property?* " (*Estate of McCreery, supra,* 220 Cal. at p. 29, italics added.)

Leaning heavily on the *ratio decidendi* of the Supreme Court of the United States in *Burnet* v. *Brooks, supra,* 288 U.S. 378, the *McCreery* court came up with an affirmative answer to both of the questions it had

[5]The *McCreery* court rejected the constitutional argument that the tax would discriminate against subjects of Great Britain in violation of treaty obligations inasmuch as the tax is also applicable to United States citizens domiciled abroad. (220 Cal. at pp. 30-31.)

[6]A constitutional controversy arose as to whether two or more states could tax the same intangibles. It was resolved in 1939 when the Supreme Court of the United States held in *Graves* v. *Elliott* (1939) 307 U.S. 383 [83 L.Ed. 1356, 59 S.Ct. 913], and *Curry* v. *McCanless* (1939) 307 U.S. 357 [83 L.Ed. 1339, 59 S.Ct. 900, 123 A.L.R. 162], that they could. (See also *State Tax Comm'n* v. *Aldrich* (1942) 316 U.S. 174 [86 L.Ed. 1358, 62 S.Ct. 1008, 139 A.L.R. 1436].) The problem of multiple taxation of intangibles by two or more states or countries has to some extent been eliminated, however, by state exemption of intangibles owned by domiciliaries of other states and by reciprocity arrangements with other countries. (E.g., Rev. & Tax. Code, § 13851.) It is not contended here, however, that there were at that time any such reciprocity arrangements with Japan.

raised. It noted that in *Burnet* "the decedent was a British citizen domiciled in Cuba, where he died owning foreign bonds and stock in foreign corporations, the physical evidences of which were all situated in the state of New York. It was held that under the United States Revenue Act of 1924, which purported to tax that part of the gross estate of said decedent 'which at the time of his death is situated in the United States' said intangibles were so situated in the United States. One of the contentions made in said cause was that such taxation was forbidden by the due process clause of the fifth amendment to the Constitution of the United States. In an able and extended opinion, carefully reviewing and quoting copiously from previous decisions of the courts, it was held that said choses in action had a situs in the United States and consequently they might be subjected to a death duty tax by the Congress and that said fifth amendment set up no barrier to the collection of such a tax. It therefore seems self-evident that *if said choses in action were property within the United States, they were at the same time property within the state of New York*; also that if the fifth amendment did not forbid taxation of the transfer of said property by the United States, the fourteenth amendment should not forbid a similar tax, if imposed by the state of New York." (*Estate of McCreery, supra,* 220 Cal. at p. 30, italics added.)

Elsewhere, *Burnet* had this to say: "The argument is pressed that the reference to situs must, as to intangibles, be taken to incorporate the principle of *mobilia sequuntur personam* and thus, for example, that the bonds here in question though physically in New York should be regarded as situated in Cuba where decedent resided. But the Congress did not enact a maxim. When the statute was passed it was well established that the taxing power could reach such securities in the view that they had a situs where they were physically located." (*Burnet v. Brooks, supra,* 288 U.S. at p. 389 [77 L.Ed. at p. 848].) The logic of the *Burnet* case was implicitly followed by the *McCreery* court in reaching its own decision.

Respondent attempts to avoid the effect of the principles set forth in *McCreery* on two grounds: first, because it is claimed that the language quoted from that case was largely dicta and should be disregarded because the main issue there was one of constitutionality rather than statutory construction. But the obvious answer is that the *McCreery* court would never have reached the constitutional question unless it first decided the issue as to whether the territorial location of the stock and stock certificates established a sufficient nexus for taxation by the State of California.

Another contention is that this case should be distinguished from *McCreery* because [] the stock certificates owned by McCreery had been issued by a California corporation. This objection overlooks the fact that *McCreery* adopted verbatim the rationale upon which *Burnet* upheld a tax on securities that included a stock certificate for shares issued by a Cuban corporation held for decedent (a resident of Cuba) by his son in New York. [] [We also note *McCreery's* statement] that where the decedent resides abroad either the "actual or constructive" situs of intangibles may be a proper place for tax assessment. (*Estate of McCreery, supra,* 220 Cal. at pp. 29-30.) ▇ Hence, we conclude that when *McCreery* was decided it became the law of this state that "the legal fiction of *mobilia sequuntur personam*" was no longer a criterion for determining the power of the state to tax intangibles owned by nonresidents of the United States.

This also appears to have been the understanding of the Legislature when one year later it enacted the Inheritance Tax Act of 1935 (Stats. 1935, ch. 358, § 1, p. 1266),[7] from which the present form of section 13303 is derived.

Before the adoption of the Inheritance Tax Act of 1935, "estate" and "property" were defined merely as "real and personal property or interest therein" including "all personal property within or without the state or subject to the jurisdiction thereof; . . ." (Stats. 1925, ch. 284, § 1, p. 472.) Thus, no distinction was drawn originally between the property owned by residents or nonresidents of the United States and there was no mention of intangibles.[8]

This was changed by section 1, subdivision (2) of the Inheritance Tax Act of 1935, which defined "estate" and "property" as used in the act to mean "real and personal property or interest therein" including "all intangible personal property of resident decedents within or without the State or subject to the jurisdiction thereof, and all stock of California

---

[7]This was one of seven major inheritance tax laws adopted by the Legislature starting with the act of 1893. In 1943, the act of 1935, as amended, was codified as part of the Revenue and Taxation Code under the title "Inheritance Tax Law." (Stats. 1943, ch. 658.) It has been the policy of the courts "to construe the several inheritance tax statutes, whether general revisions or merely amendments, as continuous in effect and as expressions of a general plan of taxation." (23 Cal.Jur.3d, Death and Gift Taxes, § 6, p. 418.)

[8]As above indicated, under the jurisdictional rules followed before *McCreery* the maxim *mobilia sequuntur personam* applied to intangibles, no matter where they were physically located. (23 Cal.Jur.3d, Death and Gift Taxes, §§ 9-13, pp. 425-432.)

corporations, and Federal corporations or National banks with their principal places of business in California, and all other intangible personal property in California belonging to the estate of a deceased nonresident of the United States; . . ." (Stats. 1935, ch. 358, pp. 1266-1267.)

■ " 'It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them. [Citations.]' (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [fn. omitted] [288 P.2d 12, 289 P.2d 242]; *Cole* v. *Rush, supra,* 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137]; *Whitley* v. *Superior Court* (1941) 18 Cal.2d 75, 78 [113 P.2d 449].)" (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874]; see also 45 Cal.Jur.2d, Statutes, § 101, pp. 615-616.)

It was therefore no coincidence that the Legislature made important changes in the statute with regard to intangible personal property belonging to nonresidents of the United States shortly after the *McCreery* decision. It is reasonable to assume that the amendments were prompted by that decision, and that in enacting the predecessor to section 13303 the Legislature intended "all other intangible personal property in California belonging to the estate of a deceased nonresident of the United States" to include stock certificates physically present in California.

II

Our final inquiry therefore is as to whether the Legislature intended to abrogate the principles established by the ruling in the *McCreery* case insofar as they may apply to stock certificates when it adopted section 13303 of the Revenue and Taxation Code in its present form. That section was added to the code in 1943, then providing as follows: " 'Estate' or 'property' means the real or personal property or interest therein of a decedent or transferor, and includes all of the following: [¶] (a) All intangible personal property of a resident decedent within or without the State or subject to the jurisdiction thereof. [¶] (b) All stock of a California corporation, or of a Federal corporation or National bank which has its principal place of business in California, and all other intangible personal property in California belonging to a deceased nonresident of the United States." (Stats. 1943, ch. 658, § 1, p. 2297.)

In 1956, subdivision (b) was amended to read as follows: "(b) All stock of a California corporation, or of a Federal corporation or National bank which has its principal place of business in California, and all other intangible personal property in California belonging to a deceased nonresident of the United States, except bank deposits, unless such deposits are held and used in connection with a business conducted or operated, in whole or in part, in California." (Stats. 1956, ch. 3, § 1, p. 121.) Thereafter in 1963, subdivision (b) was again amended. That version is the present form of the subdivision.[9]

*McCreery,* as has been seen, decreed that henceforth the situs of intangibles would be the factor that controls jurisdiction to tax in the case of a decedent domiciled outside territorial limits of the United States. This ruling was implemented by the Legislature in 1935 by expressly subjecting intangibles owned by foreign residents to taxation. In its present form, subdivision (b) of section 13303 now starts out by imposing a tax on "*All intangible* personal property *in California* belonging to a deceased nonresident of the United States, . . ." (Italics added.) Regulation 13303(d) defines "intangible personal property" as including "stocks, bonds, notes (whether secured or unsecured), bank deposits, accounts receivable, patents, trade-marks, copyrights, good will, partnership interests, life insurance policies, and other choses in action." (Cal. Admin. Code, tit. 18, reg. 13303(d).)

██ But the argument is pressed here that we should apply the familiar maxim *expressio unius est exclusio alterius,* and thus construe the clause that follows the language we have quoted from subdivision (b) of section 13303 as an expression of intent to exclude all other "stocks" not specifically mentioned in the following clause. We apprehend from the intended decision that this argument was decisive in the trial court. It is one, however, that from our more advantageous position on appellate review we are unable to accept.

The problem of interpretation, it seems to us, would have been less complicated if the parties had not overlooked the distinction between "shares" or "stocks" on the one hand, and the indicia of ownership such as "share certificates" or "stock certificates" on the other. Both have value and are considered to be personal property, but of a different kind. ██ "A *share of stock* is the *interest* which the shareholder has in the

---

[9]Both parties agree that the 1963 amendment was merely a technical change to clarify the meaning of "California corporation" as that term was originally used in the Inheritance Tax Act of 1935.

corporation." (6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 110, p. 4403.) ■ On the other hand, "[a] certificate of stock is the *evidence* of the ownership of the shares represented by it." (*Id., op. cit.,* § 112, p. 4405.)

" 'To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages and certificates of stock are regarded as property. By state and federal statutes they are often treated as property, not as mere evidences of the interests which they represent.' " (*Burnet* v. *Brooks, supra,* 288 U.S. at p. 391 [77 L.Ed. at p. 849], quoting from *DeGanay* v. *Lederer* (1919) 250 U.S. 376 [63 L.Ed. 1042, 39 S.Ct. 524].)

Keeping the separate character of the two types of property in mind, when section 13303 mentions "all stock of a corporation organized under the laws of California, or which has its principal place of business or does the major part of its business in California," this obviously refers to the actual stock that a shareholder owns in a California corporation as shown by the corporate books and records, not to the certificates representing such ownership.

■ It is true that the canon of construction upon which respondent rests its case should be applied "where appropriate and necessary to the just enforcement of the provisions of a statute." (*Blevins* v. *Mullally* (1913) 22 Cal.App. 519, 529 [135 P. 307].) Nevertheless, *expressio unius est exclusio alterius* is no magical incantation, nor does it refer to an immutable rule. Like all such guidelines, it has many exceptions, some of which are referred to in the margin.[10] More in point here, however, is the principle that such rules shall always " 'be subordinated to the primary rule that the intent shall prevail over the letter.' " (*Davis* v. *Int. Alliance etc. Employees* (1943) 60 Cal.App.2d 713, 721 [141 P.2d 486]; see also *In re Cathey* (1961) 55 Cal.2d 679, 689 [12 Cal.Rptr. 762, 361 P.2d 426]; *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 811 [151 P.2d 505, 157 A.L.R. 324]; *McNee* v. *Harold Hensgen & Associates* (1960) 178

---

[10]The rule is inapplicable: where no manifest reason exists why other persons or things than those enumerated should not be included and thus exclusion would result in injustice (*Blevins* v. *Mullally, supra,* 22 Cal.App. at p. 529); to a statute the language of which may fairly comprehend many different objects, some of which are mentioned merely by way of example, without excluding others of similar nature (*People* v. *Richards* (1927) 86 Cal.App. 86, 89-90 [260 P. 582]); to a matter which is only incidentally dealt with in a statute (*Galland* v. *Galland* (1869) 38 Cal. 265, 267-268); where its application would run counter to a well established principle of law (*Western U. Tel. Co.* v. *Superior Court* (1911) 15 Cal.App. 679 [115 P. 1091]; see also 45 Cal.Jur.2d, Statutes, § 133, pp. 639-640).

Cal.App.2d 881, 885 [3 Cal.Rptr. 377].)   Moreover, exceptions to a general provision of a statute are strictly construed and will not be understood as a limitation on general powers except to the extent the limitation fully appears. (*Hurst* v. *City & County of San Francisco* (1949) 33 Cal.2d 298, 301 [201 P.2d 805]; 45 Cal.Jur.2d, Statutes, § 134, p. 641.)   If the Legislature had intended to abolish the former rule by including stock certificates as well as "stock" in the clause upon which respondent relies, it might therefore be reasonably expected that it would have clearly said so. Hence, there is no occasion to resort to the foregoing, or any other, Latin maxim in arriving at our decision.

We note also that the introductory word to the clause in controversy (subd. (b) of § 13303) is the word "including." This is not ordinarily understood as expressing an intent to limit, or to create an exception. Its dictionary meaning is: to have as part of a whole; to take into account, put in a total category, etc.

We are not alone in our interpretation of section 13303, subdivision (b). The understanding of the meaning of the language used in that section by the authors of an article in a recent text published by the California Continuing Education of the Bar is exactly the same as our own. "Special *statutory rules regarding situs apply to intangibles owned by nondomicil-iaries of the United States. These rules turn on the nature of the intangible itself. In general, intangible personal property owned by a deceased nonresident of the United States is subject to tax by California if the evidence of ownership, or its issuer, is located in California. Rev & T C § 13303(b); Reg. § 13303(c)(3)(B).* [¶] *If the indicia of ownership of these intangibles, such as stock certificates or promissory notes, are physically located in California,* they are subject to inheritance tax. See Estate of McCreery (1934) 220 C 26, 29 P2d 186, involving a resident and citizen of Great Britain who owned stock in a California corporation. At the date of his death, the stock certificates were physically in California but had no business situs there. However, if the intangibles are stocks or bonds of a non-California corporation, a federal corporation, or a national bank, and the issuer has its principal place of business in California or does a major part of its business in California, they are subject to inheritance tax whether the evidence of ownership is located in California or outside the state. Likewise, *stocks and bonds issued by a California corporation are subject to inheritance tax no matter where the indicia of ownership are located.*" (Cal. Inheritance Tax Practice (Cont. Ed.Bar 1973) § 4.5, pp. 59-60, italics added.)

Respondent directs this court's attention to subdivision (a) of section 2104 of the Internal Revenue Code of 1954 (26 U.S.C. § 2104(a)) which now provides, "For purposes of this subchapter shares of stock owned and held by a nonresident not a citizen of the United States shall be deemed property within the United States only if issued by a domestic corporation."[11] This subdivision, however, is obviously of no aid in ascertaining the intent of the California Legislature in 1935, at which time the predecessor to section 13303 was enacted. [] [End of Court of Appeal opinion.]

To the extent it is contrary to the views herein expressed, *Estate of Hall, supra,* 71 Cal.App.3d 219, is disapproved.

The judgment is reversed and the cause is remanded with directions to set aside the order sustaining the objections to the report of the inheritance tax appraiser, and to take further proceedings in conformity with this opinion.

Respondent's petition for a rehearing was denied July 13, 1978.

---

[11]Respondent quotes from the House Committee report on section 2104: "Under present law stock held by nonresident aliens is treated as property situated in the United States if it is stock of a domestic corporation regardless of where the certificates are located, and if it is stock of a foreign corporation, if the certificates are located in the United States. [¶] Under the bill only the first of these rules is retained: Stock is to be deemed to be situated in the United States only where it is stock of a domestic corporation. [¶] This rule conforms to the tax conventions the United States has entered into with many countries and removed any deterrent to the use of United States bank and trust companies as depositories. (House Committee Report on IRC Section 2104.)" The fact that Congress enacted a change in federal law in 1954 would appear to have no bearing on what the California Legislature intended to subject to its own inheritance tax in 1935.